REGENCY SERVICES CORPORATION, Plaintiff–Appellant,

v.

BOARD OF COUNTY COMMISSIONERS OF ADAMS COUNTY, Edward Camp, Sheriff of Adams County, and James F. Smith, District Attorney for Adams County, Defendants–Appellees.

No. 91SA125.

Supreme Court of Colorado, En Banc.

Nov. 12, 1991.

---

1050

Elrod, Katz, Preeo, Look, Moison & Silverman, P.C., Eldon E. Silverman, Douglas J. Friednash, Denver, for plaintiff-appellant.

James F. Smith, Adams County Dist. Atty., Steven L. Bernard, Chief Trial Deputy, Brighton, for defendant-appellee James F. Smith.

Robert J. Lowe, Adams County Atty., Rita M. Harrell, Asst. Co. Atty., Brighton, for defendants-appellees Bd. of County Com'rs for Adams County and Edward Camp, Sheriff of Adams County.

Justice QUINN delivered the Opinion of the Court.

The question in this case is whether the Colorado Massage Parlor Code, §§ 12–48.5–101 to –119, 5B C.R.S. (1991), and Adams County Ordinance No. 2, entitled Ordinance Establishing Massage Parlor Regulations, both of which regulate commercially operated massage parlors but exempt certain types of massage procedures from governmental control, are unconstitutionally vague in violation of due process of law, violate equal protection of the laws, or suffer from unconstitutional overbreadth. The district court denied the request of Regency Services Corporation (Regency) for declaratory and injunctive relief against the enforcement of the regulatory scheme. We uphold the constitutionality of the state statute and county ordinance and accordingly affirm the judgment of the district court.

## I.

### A.

In 1977 the General Assembly enacted the Colorado Massage Parlor Code. §§ 12–48.5–101 to –119, 5B C.R.S. (1991). This statutory scheme was enacted as an exercise of the state's police powers "for the protection of the economic and social welfare and the health, welfare, and safety of the people of this state." § 12–48.5–102(1). The statute declares that the "licensing and regulation of massage parlors are matters of statewide concern," § 12–48.5–102(2), but that "[n]othing in this article shall prohibit a local government from enacting an ordinance or resolution providing more stringent standards for such licensing" so long as the ordinance meets "the minimum standards established by this article." § 12–48.5–118. The statute makes it unlawful for any person to operate a massage parlor without holding a validly issued local license. § 12–48.5–110(1)(a).

The Massage Parlor Code defines the term "massage" as "a method of treating the body for remedial or hygienic purposes, including but not limited to rubbing, stroking, kneading, or tapping with the hand or an instrument or both." § 12–48.5–103(5). A "massage parlor" is defined as:

[A]n establishment providing massage, but does not include training rooms of public and private schools accredited by the state board of education or approved by the division charged with the responsibility of approving private occupational schools, training rooms of recognized professional or amateur athletic teams, and licensed health care facilities. A facility which is operated for the purpose of massage therapy performed by a massage therapist is not a massage parlor. For purposes of this subsection (6), "massage therapist" means a person who has graduated from a massage therapy school accredited by the state educational board or division charged with the responsibility of approving private occupational schools, or from a school with comparable approval or accreditation from another state with transcripts indicating completion of at least five hundred hours

of training in massage therapy. For the purposes of this subsection (6), a massage therapy school may include an equivalency program approved by the state educational board or division charged with responsibility of approving private occupational schools.

§ 12–48.5–103(6), 5B C.R.S. (1991).[1]

Except where the state statute specifically provides otherwise, a local licensing authority, before granting a massage-parlor license, is required to consider "the reasonable requirements of the neighborhood, the desires of the inhabitants as evidenced by petitions, remonstrances, or otherwise, and all other reasonable restrictions which are or may be placed on the neighborhood by the local licensing authority." § 12–48.5–104(4). A local licensing authority is authorized to conduct a pre-licensing inspection of the proposed facility and to investigate an applicant's fitness to conduct the business. § 12–48.5–105(2)(a).[2] Any license issued by a local authority is subject to revocation or suspension for any violations of the Massage Parlor Code or other regulations promulgated pursuant to the statute. § 12–48.5–107. Violations of the state statute are criminal misdemeanors, punishable by a fine of not more than $5,000 or imprisonment for one year, or by both fine and imprisonment. § 12–48.5–111(1).

### B.

In 1989, pursuant to the statutory authorization delegated to local governments by the Massage Parlor Code, the Adams County Board of County Commissioners enacted County Ordinance No. 2 to regulate massage parlors within the county. In enacting the ordinance, the board specifically determined that the unregulated operation of massage parlors within unincorporated Adams County may adversely affect the health, safety, and welfare of residents of those areas, and specifically found, in pertinent part, as follows: that in the absence of regulation "sexual conduct or the intimation of sexual conduct, rather than the massage of the body, has or may become the business of many massage parlors"; that "the keeping of records by massage parlors will deter prostitution, obscenity, public indecency[,] further inhibit minors from frequenting such premises[,] and assist public health officials to restrain the spread of disease"; that absent the right of entry by an agent or employee of the sheriff's department or the board, the enforcement of the ordinance would be frustrated; and that "the unregulated operation of massage parlors would hinder the protection of the citizens ... from lewd and immoral acts taking place in massage parlors." Adams County Ordinance No. 2, Preface.

The county ordinance defines the term "massage" in a manner identical to the Massage Parlor Code. The term "massage parlor" is defined as follows: "an establishment providing massage, but it does not include training rooms of public and private schools accredited by the state board of education or approved by the state board for community colleges and occupational education, training rooms of recognized professional or amateur athletic teams, and licensed health care facilities." Adams

---

1. The provision in section 12–48.5–103(6) exempting a facility offering massage therapy by a massage therapist, along with the provision establishing the training requirements for a massage therapist, was enacted in 1990, subsequent to the date on which Adams County enacted County Ordinance No. 2.

2. The statute provides that a local licensing authority, after giving proper notice, must conduct a hearing on the application, at which any party in interest may present evidence and cross examine witnesses either in support of or in opposition to the application. § 12–48.5–114(5)(a) & (b), 5B C.R.S. (1991). The statute also requires a local licensing authority to consider the results of its investigation of the application, the reasonable requirements of the neighborhood, the desires of the inhabitants, the number, type, and availability of other massage parlors located in or near the neighborhood, and any other pertinent matters affecting the qualifications of the applicant for the conduct of the business. § 12–48.5–115(2), 5B C.R.S. (1991). A license may be refused if the needs of the community have been met by licenses already granted, if the premises on which the applicant proposes to conduct the business fail to meet the requirements of the state statutory scheme, or if the character of the applicant or its officers or directors is such that violations of the state statute would likely result. § 12–48.5–106, 5B C.R.S. (1991).

County Ordinance No. 2, § A(6). The county ordinance imposes requirements on the operation of a massage parlor over and above those required by the state statute. For example, the ordinance prohibits controlled substances or alcoholic beverages on licensed premises, locks on doors on the rooms where massages are given, the exposure or touching of the genitals during the massage treatment, and the viewing by a customer of the exposed breasts or buttocks of any female while on the licensed premises. Adams County Ordinance No. 2, § H(1)(i), (j), (k) & (m). Moreover, the ordinance prohibits the employment of anyone under eighteen years of age and requires massage parlors to close between the hours of 2:00 a.m. and 6:00 a.m. Adams County Ordinance No. 2, § H(1)(%il%i) & (r).[3]

Any person administering a massage to a customer of a massage parlor must obtain an identification card from the county sheriff and is required to carry the identification card at all times while in and upon the licensed premises. Adams County Ordinance No. 2, § D(3). The ordinance states that any person applying for an identification card must have obtained a certificate or diploma from "a recognized school which has provided the applicant classroom instruction for the purpose of teaching the theory, method, profession or work of massage, and which includes the study of the principles of anatomy and physiology." Adams County Ordinance No. 2, § D(3).[4] In contrast to the state statute, which does not contain a recordkeeping requirement, the ordinance requires every licensed massage parlor to keep a record of the date and hour of each massage, and the name, age, and address of the patron, as well as the name of the individual administering the massage. Adams County Ordinance No. 2, § S. Such records must be maintained "in a confidential manner by the licensee" and furnished solely to the Adams County Sheriff's Department or, upon subpoena, to the Board of County Commissioners. *Id.*

## C.

Regency has operated a facility known as Regency Health Spas within unincorporated Adams County for several years. In 1990 Regency was charged with a criminal misdemeanor for operating its massage parlor without a valid license and for failure to comply with several provisions of the county ordinance. Regency thereafter filed a civil complaint for declaratory and injunctive relief against the Adams County Board of County Commissioners, the Adams County Sheriff's Office, and the Adams County District Attorney. Regency sought a declaration that the state statute and county ordinance violated equal protection of the laws and due process of law under the United States and Colorado Constitutions, and also sought a preliminary injunction against the enforcement of the statute against its health spa operations.

The district court conducted an evidentiary hearing on Regency's request for a preliminary injunction. The evidence at the hearing established that Regency's massage parlor offers private rooms with hot tubs, jacuzzis, and suntanning equipment. Patrons can rent the rooms in half-hour blocks and can also purchase time with a topless woman, called a hostess, at the rate of $60 or $70 per hour, or with two hostesses at the rate of $100 per hour, either for conversation or for the purpose of receiving a body rub. Regency's president, Bing

---

**3.** Additional sanitary regulations mandate clean linens, separate toilet facilities, and hot and cold running water. Adams County Ordinance No. 2, § P. The ordinance also requires all employees to wear white clothing which adequately covers the pubic area, buttocks, entire chest, and legs to six inches above the knees. Adams County Ordinance No. 2, § Q.

**4.** Section D(3) of the ordinance also states:
In order to be recognized, the school shall furnish the student who has satisfactorily completed the course of study or learning a diploma or certificate of graduation. If the school is located within this state, it shall meet the qualifications established by C.R.S., Title 12, Article 59, or other applicable statutes pertaining to vocational education or be a school approved by the American Massage Therapists Association. If the school is located outside this state, it shall meet the qualifications established by this ordinance to qualify as a recognized school.

Tran, defined a body rub as an activity in which the hostess spreads warm oil, lotion, or baby powder over a patron's body exclusive of the genital area. Tran also testified that the male customer is usually nude when the body rub is administered by the female hostess. For the price of $80 per hour, customers can rub a hostess with oil. According to Tran, approximately 70 percent of Regency's patrons receive a body rub or administer a body rub to a hostess, while the remaining 30 percent of the patrons use the showers and hot tub facilities and talk to the hostesses. Tran also testified that the county ordinance would require any employee applying for an identification card to obtain 1,000 hours of formal instruction at a cost of approximately $5,000. He based this testimony on information received from the Boulder School of Massage, which is a massage school accredited by the state.

Regency also presented testimony from a coordinator of a nursing home facility regarding the training received by nurse aides and their use of various types of massages in caring for patients at the facility. Such massages, according to the coordinator, are generally used to increase a patient's circulation around a pressure sore or to relieve pain. The coordinator also testified that nurse aides are required to receive 75 hours of training.[5] The coordinator acknowledged, however, that nurse aides must be certified and pass a clinical competency evaluation by the State Board of Nursing.[6] A registered nurse who worked at a facility licensed by the state testified that nurse aides working at the facility sometimes, although infrequently, performed backrubs on the resident patients. Regency also presented the deposition testimony of a high school athletic director who testified about the massage

therapy frequently applied to high school athletes for cramps and other injuries.

At the conclusion of the hearing, the district court ruled that Regency did not establish a reasonable probability of success on its due process and equal protection challenges to the state statute and county ordinance and thus denied Regency's request for a preliminary injunction. In so ruling, the court was of the view that the definition of "massage" was not unconstitutionally vague, that the state statute and the county ordinance were proper exercises of the governmental police power, and that Regency lacked standing to challenge the regulatory scheme as unconstitutionally overbroad. The parties thereafter stipulated that the evidence admitted at the hearing on Regency's request for a preliminary injunction could be utilized by the court to resolve its request for a permanent injunction. The court denied Regency's request for declaratory and permanent injunctive relief, and this appeal followed.[7]

## II.

We first address Regency's claim that the definitions of "massage" and "massage parlor" in the state statute and county ordinance are unconstitutionally vague. Both the state statute and the county ordinance define the term "massage" as "a method of treating the body for remedial or hygienic purposes, including but not limited to rubbing, stroking, kneading, or tapping with the hand or an instrument or both." The term "massage parlor" is defined by the statute and the ordinance as "an establishment providing massage," not including, however, training rooms of accredited or approved public and private schools, training rooms of recognized professional or amateur athletic teams, and licensed

5. The curriculum for nurse aide training must include the following areas: communication and interpersonal skills; infection control; safety and emergency procedures; promoting residents' and patients' independence; and respecting residents' and patients' rights. § 12–38.1–108(3), 5B C.R.S. (1991).

6. The clinical competency evaluation for nurse aides must include the following areas: basic

nursing skills; personal care needs; recognition of mental health and social services needs; basic restorative services; and resident or patient rights. § 12–38.1–107, 5B C.R.S. (1991).

7. Appellate jurisdiction over this appeal lies in this court because the constitutionality of a state statute and county ordinance is challenged. § 13–4–102(1)(b), 6A C.R.S. (1987).

health care facilities. We find no merit in Regency's void-for-vagueness challenge.

■■■ Two interests underlie the void-for-vagueness doctrine: first, the interest in fair notice requires that a law be sufficiently definite to alert the populace to the nature of the proscribed conduct so that they may control their actions; and second, the interest in even-handed treatment requires that the law provide specific standards for those charged with its enforcement so that arbitrary and discriminatory application may be avoided. *People v. West*, 724 P.2d 623, 626 (Colo.1986); *People ex rel. City of Arvada v. Nissen*, 650 P.2d 547, 550 (Colo.1982). "The basic inquiry in a void-for-vagueness challenge is whether the statutory prohibition forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *People v. Becker*, 759 P.2d 26, 31 (Colo.1988). While a statute must be sufficiently specific to give fair warning of the prohibited conduct, it need not be drafted with mathematical precision. On the contrary, "most statutes must be cast in general terms in order to effectively deal with the particular problem addressed by the legislation under varied circumstances." *Id.* Where a challenged legislative proscription does not implicate a fundamental right—and, as we discuss in Part III, infra, no such rights are involved here—the legislation must be upheld unless a reviewing court is satisfied "that the enactment is impermissibly vague in all of its applications." *Id.* In other words, "as long as a statutory proscription 'permits persons of ordinary intelligence to distinguish between permissible and illegal conduct and provides workable standards for those responsible for the enforcement and application of the law, due process of law will be satisfied.'" *Id.* (quoting *West*, 724 P.2d at 626).

■■■ The terms "massage" and "massage parlor" are sufficiently specific so that persons of ordinary intelligence can distinguish between permissible and illegal conduct. The definition of massage in both the statute and the ordinance substantially follows the commonly understood meaning of that term. The dictionary definition of massage is a "manipulation of tissues for remedial or hygienic purposes (as by rubbing, stroking, kneading, or tapping) with the hand or other instrument (as a vibrator)." *Webster's Third International Dictionary*, 1388 (1986). Although Regency argues that the inclusion in both the statute and the ordinance of the words "including but not limited to" immediately prior to "rubbing, stroking, kneading or tapping" fatally expands the commonly understood definition of massage by encompassing any activity used to treat the body for remedial or hygienic purposes, we find Regency's interpretation at odds with the commonly understood meaning of "massage." In general parlance, the term "massage" is taken to mean physical contact between the hands of the person applying the massage, or a tapping or vibrating instrument held in the hand of that person, and the body of the person receiving the massage, for the purpose of relieving pain or easing muscular tension. The words "including but not limited to" in the statute and ordinance manifest a legislative intent to encompass within the meaning of "massage" not only the specifically enumerated acts of "rubbing, stroking, kneading, or tapping," but also acts of a similar character not specifically listed. *See Lyman v. Town of Bow Mar*, 188 Colo. 216, 222, 533 P.2d 1129, 1133 (1975) (the word "include" ordinarily a word of enlargement). Viewed in that sense, the phrase "including but not limited to" does not render the legislative definition of massage so ambiguous or vague as to mislead persons of ordinary intelligence in distinguishing between legal and proscribed conduct.

The term "massage parlor" is similarly without constitutional infirmity. This term simply means any establishment providing a massage, except licensed health care facilities, training rooms of accredited or approved public and private schools, and training rooms of recognized professional or amateur teams. A person of ordinary intelligence operating a commercial massage parlor would have no difficulty in understanding the meaning of "massage"

and "massage parlor" as those terms are used in both the statute and the ordinance.

### III.

Regency proffers two arguments in support of its equal protection claim: first, the state statute and county ordinance adversely affect the fundamental right to pursue a livelihood and thus fail to satisfy the strict scrutiny standard applicable to equal protection analysis; and second, the regulatory scheme adversely affects the fundamental rights of privacy and freedom of association and thus fails to pass muster under strict judicial scrutiny. As a separate basis for challenging the regulatory scheme on equal protection grounds, Regency argues that the statute and the ordinance impose more stringent standards on the class of persons operating and working in commercial massage parlors than are applicable to other classes exempted from the regulatory scheme and thus unreasonably discriminate against commercial massage parlors.[8]

When a regulatory scheme affects the exercise of a fundamental right—such as a right of speech, association, or religion—or creates a suspect class—such as a class based on race or national origin—a standard of strict judicial scrutiny must be applied in resolving an equal protection challenge. *E.g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Jarmel v. Putnam,* 179 Colo. 215, 499 P.2d 603 (1972). The government in such a case must establish that the classification is necessarily related to a compelling governmental interest. Moreover, certain classifications, such as illegitimacy and gender, have been analyzed under an intermediate standard of review pursuant to which the

government is required to demonstrate a substantial relationship between the classification and an important governmental objective. *E.g., Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d ⁀06 (1979); *R. McG. v. J.W.,* 200 Colo. 345, 615 P.2d 666 (1980).

In the absence of a fundamental right, a suspect class, or a classification triggering an intermediate standard of scrutiny, a rational basis standard of review is applicable. *E.g., San Antonio Indep. School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Tassian v. People,* 731 P.2d 672 (Colo.1987). Under the rational basis standard of review, a regulatory scheme will be upheld as long as the classification is based on differences that are real, rather than illusory, and the classification is reasonably related to a legitimate state interest. *E.g., San Antonio Indep. School Dist.,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16; *Lindsey v. Normet,* 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); *Branson v. City and County of Denver,* 707 P.2d 338 (Colo.1985); *Tassian,* 731 P.2d 672. There is a presumption of constitutionality attaching to a classification analyzed under the rational basis standard of review, and the party challenging the constitutionality of the regulatory scheme must establish its unconstitutionality beyond a reasonable doubt. *E.g., Hurricane v. Kanover, Ltd.,* 651 P.2d 1218 (Colo.1982); *Smith v. Charnes,* 649 P.2d 1089 (Colo.1982).

### A.

Regency contends that the training requirements of the regulatory scheme and the expenses resulting from compliance burden its fundamental right to pursue a

---

8. Regency asserts in its brief that the state statute and county ordinance violate Article V, section 25 of the Colorado Constitution, which prohibits special legislation. Regency, however, relies exclusively on equal protection principles in support of its assertion. Regency's characterization of the statute and ordinance as special legislation is without merit. A special law is one that applies to particular persons or entities but not to others, without any reasonable basis for the difference in treatment. *E.g., City of Montrose v. Public Utilities Comm'n,* 732 P.2d 1181, 1190 (Colo.1987). Both the statute and ordinance under consideration operate uniformly upon all commercial massage parlors and thus constitute general laws. *E.g., People ex rel. Johnson v. Earl,* 42 Colo. 238, 264, 94 P. 294, 302 (1908). We therefore analyze Regency's claim solely under an equal protection analysis.

livelihood and thus trigger strict judicial scrutiny under equal protection analysis. Regency's claim, in our view, proceeds from the erroneous assumption that the general right to pursue a livelihood requires that any governmental control over a particular business be limited to regulations which are necessarily related to the attainment of some obviously compelling governmental interest.

■ Although we have recognized that the right to work and receive the fruits of one's labor is an important right, *City and County of Denver v. Thrailkill*, 125 Colo. 488, 499, 244 P.2d 1074, 1079 (1952), we have never held that an individual has a fundamental constitutional right to pursue a specific occupation or business unfettered by governmental regulations that do not satisfy strict judicial scrutiny. On the contrary, the rational basis standard of review has consistently been applied to governmental legislation restricting the availability of employment opportunities. *E.g., Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *see Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). For purposes of equal protection analysis, therefore, we conclude that there is no fundamental right to operate a commercial massage parlor and that the rational-basis test is controlling. *Pollard v. Cockrell*, 578 F.2d 1002, 1012 (5th Cir.1978) (because there is no fundamental right to operate a massage parlor, rational basis standard of review is controlling on validity of massage parlor regulations); *accord, Harper v. Lindsay*, 616 F.2d 849, 854 (5th Cir.1980); *Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 490 (7th Cir. 1988); *MRM, Inc. v. City of Davenport*, 290 N.W.2d 338, 342 (Iowa 1980); *Massage Parlors, Inc. v. Mayor and City Council*

*of Baltimore*, 284 Md. 490, 398 A.2d 52 (1979).[9]

### B.

■ Regency also argues that the regulatory scheme, including the record-keeping requirements imposed on massage parlors,[10] adversely affects its privacy and associational interests and those of its employees and patrons and therefore requires the application of strict judicial scrutiny. The right of privacy "encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and childrearing." *Paris Adult Theater I v. Slaton*, 413 U.S. 49, 65, 93 S.Ct. 2628, 2639, 37 L.Ed.2d 446 (1973). The fact that certain activities may be entitled to constitutional protection when conducted in the private setting of the home or its equivalent, however, does not mean that these same activities are constitutionally protected when conducted in a commercial establishment. As the Supreme Court remarked in *Paris Adult Theater I*, "[t]he idea of a 'privacy' right and a place of public accommodation are, in this context, mutually exclusive." *Id.* at 66, 93 S.Ct. at 2640. In our view, a patron of a commercial massage parlor has no reasonable expectation that a body rub will be constitutionally protected as an integral part of the right of privacy any more than a viewer of an obscene movie in a public theater can legitimately claim a constitutionally protected right of privacy with respect to the viewing. *Paris Adult Theatre I*, 413 U.S. at 69, 37 L.Ed.2d 446 (no fundamental right of privacy to watch obscene movies in places of public accommodation); *see also, e.g., Pollard*, 578 F.2d at 1016 (constitutional right of privacy not offended when patron of commercial massage parlor seeking to purchase services of a masseuse is re-

9. There is no suggestion in our prior decisions addressing the licensing of commercial massage parlors that any standard other than the rational-basis test is controlling. *E.g., J.R.M. v. Board of County Comm'rs of Adams County*, 200 Colo. 384, 615 P.2d 31 (1980); *R & F Enterprises v. Board of County Comm'rs of Adams County*, 199 Colo. 137, 606 P.2d 64 (1980).

10. During the hearing on the request for a preliminary injunction, Regency acknowledged that it was not centering its constitutional challenge on the record-keeping requirement of the ordinance, and the district court alluded to that fact during the oral ruling at the conclusion of the hearing. However, we need not resolve Regency's claim on the basis of an arguable waiver, and we prefer instead to address the merits of Regency's argument.

quired to provide identification); *Wigginess, Inc. v. Fruchtman,* 482 F.Supp. 681, 689 (S.D.N.Y.1979) (no right of privacy attaches to activities carried on in commercial health spas and health clubs), *aff'd,* 628 F.2d 1346 (2d Cir.), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 50 (1980). Because the state and county training and record-keeping requirements do not implicate the privacy rights of Regency, or its employees or customers, we reject Regency's claim that the regulatory scheme must be subjected to strict judicial scrutiny.

We similarly find no merit in Regency's claim that the regulatory scheme so affects its associational interests and those of its employees and patrons as to warrant strict judicial scrutiny. We have no quarrel with the proposition that the constitutional right to associate "protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships." *Board of Directors of Rotary Int'l. v. Rotary Club of Duarte,* 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987). Determining the limits of governmental authority over a person's freedom to enter into a particular association "entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Roberts v. United States Jaycees,* 468 U.S. 609, 620, 104 S.Ct. 3244, 3251, 82 L.Ed.2d 462 (1984). A constitutionally protected associational interest arising from personal relationships presupposes "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs, but also distinctively personal aspects of one's life." *Id.* at 620, 104 S.Ct. at 3250. No such interest is implicated in this case.

■ The diminished privacy expectation attaching to patrons of a commercial massage parlor, *see Pollard,* 578 F.2d at 1016; *Wigginess, Inc.,* 482 F.Supp. at 689, and the manifestly commercial character of the massage parlor negate any notion that the administration of a body rub in such an establishment somehow implicates either the fundamental right of privacy or the freedom of association on the part of an operator, employee, or patron of the massage parlor. In light of the presumption of constitutionality attaching to a regulatory scheme not affecting a fundamental right, and in view of the legitimate governmental interests in protecting public health and deterring unlawful sexual conduct in massage parlors, we reject Regency's assertion that strict judicial scrutiny requires the invalidation of the state statute and county ordinance.

### C.

Under the rational basis standard of review, "it is not the province of the court to weigh the policy arguments in favor of or against the regulations or to determine whether the same ends could be reached through different or less onerous restrictions." *Harper,* 616 F.2d at 854 (quoting *Harper v. Lindsay,* 454 F.Supp. 597, 601 (S.D.Tex.1978). The proper inquiry under the rational basis standard is whether the regulatory scheme bears a reasonable relationship to a legitimate governmental interest.

■ There is no question that the government has a legitimate interest not only in regulating various forms of conduct which can adversely affect public health but also in prohibiting various forms of unlawful sexual conduct, including prostitution. Although Regency, as the operator of a commercial massage parlor, might incur appreciable expenses in complying with the training requirements of the regulatory scheme, we are satisfied that any such financial burden is reasonably related to the legitimate interests of the state and the county. *See also Rogers v. Miller,* 401 F.Supp. 826, 829 n. 1 (E.D.Va.1975) (upholding 1,000–hour training requirement for commercial masseurs); *MRM, Inc.,* 290 N.W.2d at 343–44 (upholding 750–hour training requirement for employees of commercial massage parlors); *Massage Parlors v. Mayor and City Council of Baltimore,* 398 A.2d at 57 n. 5 (upholding 500–hour training requirement for workers in

commercially operated massage parlors). It is also obvious to us that the record-keeping requirements are reasonably related to curbing the spread of disease and to the deterrence of unlawful sexual conduct.

## D.

We turn then to Regency's third basis for challenging the regulatory scheme on equal protection grounds, namely, that the state statute and the county ordinance unreasonably discriminate against owners and employees of massage parlors by imposing more stringent standards upon them than are applicable to other classes of persons exempted from regulation. We find no merit in this argument.

There is a rational basis in fact for imposing on massage parlors various regulations that are not required of persons exempted from the regulatory scheme, such as nurse aides and athletic trainers. It is not unreasonable to assume that there is some risk of disease-transmission when a topless masseuse administers a body rub to a nude male customer, and when they administer a body rub to each other, in a commercial massage parlor. The record shows that such contact is not uncommon in Regency's facilities, but does not occur in licensed health care facilities and athletic training rooms. More importantly, there is no question that the opportunity for prostitution and other forms of unlawful sexual conduct is more likely to occur in the titillating atmosphere of an unregulated commercial massage parlor, where a topless woman is rubbing the body of a nude man, than where a fully clothed nurse aide is rubbing the aches and pains of an elderly patient or where a fully clothed athletic trainer is rubbing an injured football player's back, arm, or leg. *See Hilbers v. Municipality of Anchorage*, 611 P.2d 31, 41 (Alaska 1980) (opportunity for prostitution much greater in commercially operated massage parlor). These differences in fact provide ample justification for the governmental imposition of somewhat exacting regulations on commercial massage parlors, while exempting other classes, namely, nurse aides and athletic trainers, from that same regimen.

In *MRM, Inc.*, 290 N.W.2d at 343, the Iowa Supreme Court, in upholding a 750–hour training requirement for employees of commercial massage parlors, stated:

It is not unreasonable for the city to require of one proposing to sell massage services to the public, that such person demonstrate evidence of training and knowledge in that field. The opinion of the legislative body as to what training is an essential prerequisite for the public health and safety, to prevent injury or the spread of disease, is presumptively valid. In the absence of any clear demonstration by [the massage parlor operator] that the requirements are unrelated to the purposes of the act, the courts will not substitute their opinions for that of the legislative authorities.

(quoting *Clevenger v. City of East Moline*, 44 Ill.App.3d 168, 172–73, 2 Ill.Dec. 552, 556, 357 N.E.2d 719, 723 (1976)). We agree with the Iowa court's analysis and thus reject Regency's equal protection challenge to the Colorado Massage Parlor Code and Adams County Ordinance No. 2.

## IV.

Regency's final challenge to the regulatory scheme is premised on the constitutional principle of overbreadth. Regency argues that it may properly invoke the overbreadth doctrine because the regulatory scheme implicates its fundamental interests of privacy and association as well as the privacy and associational interests of its employees and patrons. Although the district court determined that Regency lacked standing to raise the overbreadth issue, we elect to address Regency's claim.

A regulatory scheme suffers from constitutional overbreadth if it threatens the existence of protected fundamental rights by encompassing those protected activities within its prohibition. *Becker*, 759 P.2d at 29. Because the infringement on such fundamental rights may cause others not before the court to refrain from exercising their fundamental rights, "expanded standing is accorded in overbreadth cases

to permit a party to assert not only its own constitutionally protected interests but also the constitutionally protected rights of others." *Id.* In light of the fundamental nature of the rights implicated by the overbreadth doctrine, "a heightened level of scrutiny is involved in overbreadth analysis." *Id.* Where, however, fundamental freedoms are not implicated, a regulatory scheme will pass constitutional muster as long as it is reasonably related to a legitimate governmental interest. *E.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–97, 102 S.Ct. 1186, 1191–92, 71 L.Ed.2d 362 (1982); *Becker,* 759 P.2d at 29.

As we previously discussed in Part III(A) and (B), supra, the state statute and the county ordinance do not affect any fundamental constitutional rights of Regency, its employees, or patrons. On the contrary, the regulatory scheme is directed at commercial activities which, if unregulated, can pose a risk to public health, safety, and welfare. Under such circumstances, the regulatory scheme need only be reasonably related to a legitimate governmental interest. As we also previously noted in Part III(C) and (D), both the state statute and the county ordinance are rationally related to the legitimate governmental interests in protecting public health and deterring unlawful sexual conduct in commercially operated massage parlors. Under such circumstances, Regency's overbreadth argument must fail.

The judgment of the district court is affirmed.