2013 CO 39

**QWEST CORPORATION, Petitioner**

v.

**COLORADO DIVISION OF PROPERTY TAXATION, Department of Local Affairs, State of Colorado, Respondent.**

**Supreme Court Case No. 11SC669**

Supreme Court of Colorado,
En Banc.

June 24, 2013

Rehearing Denied Aug. 5, 2013*

* Justice Eid and Justice Boatright would grant the petition. Justice Coats does not participate.

Attorneys for Petitioner: Gibson, Dunn & Crutcher, Gregory J. Kerwin, M. Scott Campbell, Denver, Colorado, Garlin Driscoll Howard, LLC, David J. Driscoll, Sarah A. Croog, Louisville, Colorado, Hawley, Troxell, Richard G. Smith, Boise, Idaho, Qwest Corporation, Roy Adkins, Denver, Colorado.

Attorneys for Respondent: John W. Suthers, Attorney General, Robert H. Dodd, Jr., Senior Assistant, Attorney General, Denver, Colorado

Justice RICE delivered the Opinion of the Court.

¶ 1 We granted certiorari to determine whether the court of appeals erred in holding that Respondent Colorado Division of Property Taxation, Department of Local Affairs, State of Colorado ("DPT") correctly declined to extend the intangible property exemption in section 39–3–118, C.R.S. (2012), and the cost cap valuation method in section 39–1–103(13), C.R.S. (2012), to Petitioner Qwest Corporation's property. We affirm the court of appeals' affirmation of DPT's interpretation of those provisions and hold that Qwest, as a public utility, is valued centrally in accordance with section 39–4–102, C.R.S. (2012), and is therefore not entitled to the intangible property exemption or the cost cap valuation method.

¶ 2 Given our understanding of the relevant statutes, we also consider whether DPT's valuation method for Qwest's property violates Qwest's constitutional guarantee under the Equal Protection Clause or violates Qwest's rights under the Uniform Taxation Clause of the Colorado Constitution. We hold that DPT's interpretation does not violate Qwest's constitutional rights and accordingly affirm the court of appeals.

## I. Facts and Procedural History

¶ 3 Qwest is a public utility. *See* § 39–4–101(3)(a), C.R.S. (2012). As such, its property is centrally assessed by the DPT administrator. *See* § 39–4–102(1). When a public utility's property is centrally assessed, the property's value is determined at the state level by the DPT administrator and then apportioned to the counties for the collection of the local property tax. *See* § 39–4–106(2)(d), C.R.S. (2012).

¶ 4 Qwest competes with various cable companies for telephone service customers.

Qwest believes it is competitively disadvantaged because these companies, for the most part, are not taxed in the same way. Rather, property owned by cable companies is locally assessed. And, relevant to this appeal, only property which is locally assessed is subject to the intangible property exemption and the cost cap valuation method. Since Qwest's property is centrally assessed, it is not entitled to the intangible property tax exemption or the cost cap valuation method.

¶ 5 Seeking to remedy the perceived competitive disadvantage resulting from its valuation as a public utility, Qwest filed a protest with DPT in which it sought to obtain equalization between itself and similarly situated cable companies. Qwest requested that DPT apply the intangible property exemption and the cost cap valuation method to Qwest's property. On August 1, 2009, DPT issued its final valuation of Qwest and refused to extend the intangible property exemption or the cost cap valuation method to Qwest's property. Having failed to receive a favorable tax assessment, Qwest brought suit for tax equalization against DPT in Denver district court.

¶ 6 As detailed in Qwest's complaint,[1] Qwest alleges "that the benefits of the 'cap' on taxable value and the exemption of intangibles, pursuant to [sections 39–1–103(13) and 39–3–118,] respectively, are enjoyed by cable companies," and thus put Qwest at an illegal disadvantage. According to Qwest, "the incremental equipment used by cable companies to provide [telecommunication] services is apparently being reported to [DPT] to be taxed as 'telephone company' property within [DPT's] assessment jurisdiction. However ... the cable company infrastructure that is used by [cable] companies to complete the telecommunications services connection is reported and valued locally by the county assessor as cable television property. [Therefore,] ... less than 10% of cable company property is being centrally assessed." Thus, Qwest claims that cable companies underreport their telecommunication property and accordingly pay less than Qwest in property taxes.

¶ 7 In short, Qwest alleged that DPT improperly assessed its property by failing to apply the intangible property exemption and the cost cap valuation method. It further asserted that DPT's failure to do so violated Qwest's constitutional right to equal protection and its guarantee to uniform taxation.

¶ 8 DPT moved to dismiss Qwest's complaint. DPT contended that the intangible property exemption and the cost cap valuation method only apply to locally assessed companies, and also maintained that this interpretation did not violate Qwest's guarantee to equal protection or uniform taxation. The trial court granted DPT's motion and held that Qwest failed to state a valid claim as a matter of law.

¶ 9 Qwest appealed and a unanimous division of the court of appeals affirmed. *Qwest Corp. v. Colo. Div. of Prop. Taxation,* —— P.3d ——, ——, 2011 WL 3332876 (Colo.App. 2011) (selected for official publication). The court of appeals upheld DPT's interpretation of the tax statutes, and concluded that Qwest was not entitled to either the intangible property exemption or the cost cap valuation method. *Id.* at ————. The court of appeals agreed with the trial court that taxing Qwest centrally and cable companies locally does not violate Qwest's constitutional guarantee to equal protection. *Id.* at ——. The court of appeals also held that DPT's interpretation of the tax statutes does not violate the Uniform Taxation Clause of the Colorado Constitution. *Id.* at ——.

¶ 10 Qwest petitioned this Court for certiorari review of the court of appeals' decision. We granted certiorari to address three issues: (1) Whether the court of appeals erred in holding that the intangible property exemption and the cost cap valuation method do not apply to Qwest, a public utility; (2) whether the court of appeals erred in rejecting Qwest's equal protection claim; and (3) whether the court of appeals erred in dismissing Qwest's claim under the Uniform Taxation Clause of Colorado's Constitution.

1. We accept the allegations in Qwest's complaint as true because this appeal involves DPT's mo-

tion to dismiss. *See Denver Post Corp. v. Ritter,* 255 P.3d 1083, 1088 (Colo.2011).

## II. Standard of Review

¶ 11 For purposes of this case, we review the relevant tax provisions de novo. *See MDC Holdings, Inc. v. Town of Parker,* 223 P.3d 710, 717 (Colo.2010). As for the constitutional questions presented, this Court interprets and applies constitutional provisions de novo. *Washington Cnty. Bd. of Equalization v. Petron Dev. Co.,* 109 P.3d 146, 149 (Colo.2005).

¶ 12 This appeal turns on the merits of DPT's motion to dismiss. A motion under C.R.C.P. 12(b)(5) "to dismiss [a complaint] for failure to state a claim upon which relief can be granted serves as a test of the formal sufficiency of a plaintiff's complaint." *Pub. Serv. Co. v. Van Wyk,* 27 P.3d 377, 385 (Colo.2001) (citation omitted). Trial courts do not view motions to dismiss favorably and grant them only where "it appears beyond a doubt that a plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Id.* at 385–86 (citation and emphasis omitted). Accordingly, when reviewing a trial court's order granting a C.R.C.P. 12(b)(5) motion, we take all of the non-moving party's, here Qwest's, material factual averments as true. *Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 911 (Colo.1996).

## III. Analysis

¶ 13 We first interpret section 39–3–118, the intangible property exemption, and section 39–1–103(13), the cost cap valuation method, in light of section 39–4–102, which provides the valuation method for public utilities. After determining that Qwest, as a public utility, is not entitled to the intangible property exemption or the cost cap valuation method, we address Qwest's constitutional arguments.

¶ 14 We hold that Qwest cannot state an equal protection claim because even if its cable company competitors are taxed differently, the distinction has a sound basis in policy. Finally, we hold that Qwest cannot state a claim under Colorado's Uniform Taxation Clause because the plain language of that provision anticipates disparate tax treatment between territorial authorities levying tax.

### A. Statutory Interpretation

¶ 15 We hold that, as a public utility, Qwest is not entitled to either the intangible property exemption or the cost cap valuation method in the tax code.

¶ 16 This Court interprets statutes by considering the provisions' plain language to properly construe the General Assembly's intent. *Jefferson Cnty. Bd. of Equalization v. Gerganoff,* 241 P.3d 932, 935 (Colo.2010). In considering Colorado's tax statutes, it is particularly important "not [to read the statutes] in isolation[,] but [rather] together with all other statutes relating to the same subject or having the same general purpose, to the end that [the statutes'] intent may be ascertained and absurd consequences avoided." *Huddleston v. Bd. of Equalization,* 31 P.3d 155, 159 (Colo.2001) (citation omitted). We therefore "construe [the] entire statutory scheme in a manner that gives consistent, harmonious, and sensible effect to all of its parts." *Climax Molybdenum Co. v. Walter,* 812 P.2d 1168, 1174 (Colo.1991). And we strive to interpret statutes in a manner that avoids rendering any provision superfluous. *Welby Gardens v. Adams Cnty. Bd. of Equalization,* 71 P.3d 992, 995 (Colo.2003) (citation omitted).

¶ 17 Qwest is a public utility and does not contend otherwise. *See* § 39–4–101(3)(a). Section 39–1–103(3) provides that the "value for property tax purposes of the operating property and plant of all public utilities doing business in this state shall be determined by the administrator, as provided in [section 39–4–102]." Thus, unlike most companies—assessed at the county level—public utilities are "centrally assessed" by the DPT administrator. *Compare* § 39–4–102 (providing for central assessment of the actual value of public utilities), *with* § 39–1–103(5)(a) ("All real and personal property shall be appraised and the actual value thereof for property tax purposes determined by the assessor of the county wherein such property is located."); *see also* § 39–5–101, C.R.S. (2012) ("The assessor shall list all taxable real and personal property located within his county on the assessment date, other than that comprising the property and

plant of public-utilities."). Section 39–4–102 directs the DPT administrator to "determine the actual value of the operating property and plant of each public utility [by] giving consideration to [among other factors, the value of a public utility's] intangibles, such as special privileges, franchises, contract rights and obligations, and rights-of-way." § 39–4–102(1)(b). Besides explicitly directing the DPT administrator to consider the value of public utilities' intangible property, that section more generally lists all relevant considerations for determining a public utility's value. *See* § 39–4–102(1) ("The administrator shall determine the actual value of the operating property [of] each public utility [by] giving consideration to the following factors . . . ."). Thus, section 39–4–102 provides a detailed method for the DPT administrator to apply when valuing public utilities.

¶ 18 Neither the intangible property exemption nor the cost cap valuation method fall under the method outlined in section 39–4–102. Qwest, as a public utility, is therefore not entitled to the exemption for intangible property because that exemption would render the intangible property factor for public utility valuation meaningless. *See Welby Gardens,* 71 P.3d at 995. The DPT administrator cannot simultaneously factor Qwest's intangible property into Qwest's value and exempt that property from taxation. Thus, giving the words in section 39–4–102(1)(b) their ordinary meaning, the DPT administrator must consider the value of intangible property when valuing Qwest, a public utility. *See United States Transmission Sys., Inc. v. Bd. of Assessment Appeals,* 715 P.2d 1249, 1258 (Colo.1986) (holding that public utility telephone company did not qualify for the intangible property exemption because "the special provision for public utility taxation must prevail over the general exemption for intangible personal property"). We hold that the intangible property exemption does not apply to Qwest.

¶ 19 Along those same lines, the cost cap valuation method does not apply to Qwest because that provision caps the value of any locally assessed entity to the cost cap valuation method. *See* § 39–1–103(13). Such a limit cannot govern Qwest's valuation be-

cause Qwest's value is determined pursuant to the explicit factors articulated in section 39–4–102. *Climax Molybdenum Co.,* 812 P.2d at 1174; *see OPEX Commc'ns, Inc. v. Prop. Tax Adm'r,* 166 P.3d 225, 229–30 (Colo. App.2007). Therefore, we hold that the cost cap valuation method does not apply to Qwest.

¶ 20 In sum, we hold that Qwest, as a public utility, is not entitled to either the intangible property exemption or the cost cap valuation method in the tax code because it is a public utility and its value is therefore determined by considering the factors enumerated in section 39–4–102. Having dealt with Qwest's statutory interpretation arguments, we now turn to Qwest's constitutional concerns.

## B. Equal Protection

¶ 21 We hold that Qwest's inability to obtain either the intangible property exemption or the cost cap valuation method does not violate the Equal Protection Clause of the United States Constitution or its Colorado equivalent.

¶ 22 The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Although the Colorado Constitution does not contain an identical provision, it is well-established that a like guarantee exists within the constitution's due process clause, Colo. Const. art. II, sec. 25, and that its substantive application is the same insofar as equal protection analysis is concerned." *Lujan v. Colo. State Bd. of Educ.,* 649 P.2d 1005, 1014 (Colo.1982). The Colorado Constitution therefore also "require[s] like treatment of persons who are similarly situated." *Bath v. Colo. Dep't of Revenue,* 758 P.2d 1381, 1385 (Colo.1988) (citations omitted); Colo. Const. art. II, § 25.

¶ 23 When this Court considers equal protection claims that do not involve a fundamental right or suspect classification, we presume the challenged statute is constitutional. *Regency Servs. Corp. v. Bd. of Cnty. Comm'rs,* 819 P.2d 1049, 1056 (Colo. 1991). The party challenging the constitu-

tionality of the regulatory scheme must establish its unconstitutionality beyond a reasonable doubt, *People v. Hickman,* 988 P.2d 628, 634 (Colo.1999), because "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). A challenged statute therefore passes constitutional muster where there is "any reasonably conceivable state of facts that could provide a rational basis for the [challenged] classification." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

▎ ¶ 24 The General Assembly has "especially broad latitude in creating classifications and distinctions in tax statutes." *Armour v. City of Indianapolis,* —— U.S. ——, 132 S.Ct. 2073, 2080, 182 L.Ed.2d 998 (2012) (citation and internal quotation marks omitted); *see F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920) (reviewing a Virginia corporate tax provision and holding that "[t]he latitude of discretion is notably wide in the classification of property for purposes of taxation and the granting of partial or total exemptions upon grounds of policy"). Accordingly, where a tax classification is not "palpably arbitrary" and is supported by "a plausible policy reason," we will not strike it down. *Nordlinger,* 505 U.S. at 11, 18, 112 S.Ct. 2326; *Regency Servs. Corp.,* 819 P.2d at 1056.

▎ ¶ 25 The General Assembly's central assessment of public utilities' property and local assessment of some portion of cable companies' property involves neither a fundamental right nor a suspect classification. *See* *Regency Servs. Corp.,* 819 P.2d at 1056. We therefore presume the challenged statutory scheme is constitutional unless Qwest establishes otherwise beyond a reasonable doubt. *Nordlinger,* 505 U.S. at 11, 112 S.Ct. 2326; *Regency Servs. Corp.,* 819 P.2d at 1056.

▎ ¶ 26 Qwest claims that central assessment of public utilities is arbitrary beyond a reasonable doubt because it prevents public utilities from receiving certain tax benefits enjoyed by cable companies offering competing telephone services. As detailed in Qwest's complaint, cable companies have gained a significant share of the local telephone market because technological advances allow "competing infrastructure platforms [to] provide essentially similar multimedia experiences." Therefore, "[b]oth [cable] and telephone companies are scrambling for customer market penetration by providing generally the same service." Thus, while they compete for the same customers, cable companies allegedly face a lower tax burden because they are locally assessed.

¶ 27 Qwest maintains that the Equal Protection Clause requires this Court instruct DPT to "assess all cable company property on a central assessment basis, as Wyoming does and other states are considering." Alternatively, Qwest argues that we direct DPT to change how it calculates Qwest's tax liability. As opposed to central assessment, Qwest argues that DPT should "identify the intangible property of telephone companies and exclude it from the total value, and identify the personal property of those companies and apply the cost approach as the limit of assessment."[2] Even taking the allegations in Qwest's complaint as true, Qwest's legislative proposals do not come close to negating "every conceivable basis which might support" centrally assessing public utilities while locally assessing cable companies. *Armour,* 132 S.Ct. at 2082 (citation and internal quotation marks omitted).

¶ 28 In this case, a number of policy considerations justify the General Assembly's decision to subject public utilities to central assessment while locally assessing their cable competition. To start, telephone company public utilities enjoy benefits not provided to cable companies. Telecommunication public utilities, may, for example, occupy public rights-of-way without additional authorization or a franchise from local municipalities.

**2.** Qwest's arguments appear better suited for the General Assembly—where they were originally offered.

*See* § 38–5.5–104, C.R.S. (2012). Cable companies compete for customers without this advantage. The General Assembly may have sought to encourage local cable companies' competitive foray into the telecommunication market against public utilities, which have historically benefited from rate-making designed to guarantee a reasonable rate of return upon their investment. *See, e.g., Colo. Mun. League v. Pub. Util. Comm'n,* 687 P.2d 416, 419–20 (Colo.1984) (reviewing a telecommunication public utility's rate-making to ensure the rate guaranteed "a reasonable return on investment"). The General Assembly may also have determined that any inequity is on-balance insignificant because— as Qwest concedes in its complaint—cable television companies are centrally assessed for that portion of their property related to telephone service. *See* § 39–4–103, C.R.S. (2012).

¶ 29 Recent United States Supreme Court precedent supports our holding that Qwest does not suffer under an Equal Protection violation. In *Fitzgerald v. Racing Association of Central Iowa,* 539 U.S. 103, 105, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003), the United States Supreme Court addressed a similar claim involving Iowa's unequal tax treatment of slot machine revenue. Iowa taxed revenue from slot machines at racetracks at a 36 percent rate while only taxing revenue from slot machines on riverboats at a 20 percent rate. *Id.* Iowa essentially exempted slot machines on riverboats from some portion of the tax burden faced by slot machines at racetracks. *Id.* The Supreme Court nonetheless upheld Iowa's slot machine tax regime. *Id.* at 110, 123 S.Ct. 2156. It opined that "[o]nce one realizes that not every provision in [ ] law must share a single objective, one has no difficulty finding the necessary rational support for the 20 percent/36 percent differential [ ] at issue." *Id.* at 109, 123 S.Ct. 2156. The Court advanced a commonsense reason for the disparity; noting that Iowa's "legislators may have wanted to encourage economic development of river communities or to promote riverboat history, say, by providing incentives for riverboats to remain in the State." *Id.* "Consequently," the Court concluded, Iowa's "differential tax rate does not violate the Federal Equal Protection Clause." *Id.* at 110, 123 S.Ct. 2156.

¶ 30 Qwest, like the racetrack owners in *Fitzgerald,* seeks a level playing field in the state tax code. And, though Qwest's policy arguments in favor of such equal treatment may eventually persuade the General Assembly to amend the tax code, "[t]he task of classifying persons for [benefits] inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id.* at 108, 123 S.Ct. 2156 (citation and quotation marks omitted).

¶ 31 Like the Court in *Fitzgerald,* we refuse to make policy tradeoffs under cover of the Equal Protection Clause. *See Gates Rubber Co. v. S. Suburban Metro. Recreation & Park Dist.,* 183 Colo. 222, 227, 516 P.2d 436, 438 (1973) (opining that "taxation is indisputably a legislative prerogative"). Qwest cannot state a viable Equal Protection Clause claim because, even taking Qwest's allegations as true, the differential tax treatment is consistent with rational policy choices. Allowing this case to proceed beyond DPT's motion to dismiss would serve no legitimate purpose because it would merely allow Qwest to provide additional evidence supporting the immaterial fact that Qwest's tax burden is different than that of its competition. That Qwest faces a different tax burden as compared to its cable company competition in the telephone service industry does not violate the Equal Protection Clause of the United States Constitution or its Colorado equivalent.

## C. Uniform Taxation

¶ 32 Qwest claims that DPT's current assessment procedure violates Colorado's Uniform Taxation Clause. Taking Qwest's allegations as true, we hold that the plain language of the Uniform Taxation Clause permits the challenged assessment scheme.

¶ 33 To resolve this issue, we interpret and apply Colorado's Uniform Taxation Clause. Colo. Const. art. X, § 3. "When

construing a constitutional amendment courts must ascertain and give effect to the intent of the electorate adopting the amendment." *Zaner v. City of Brighton*, 917 P.2d 280, 283 (Colo.1996) (citation omitted). As with statutes, we discern the General Assembly's intent by examining the plain language of the constitutional provision at issue. *Bolt v. Arapahoe Cnty. Sch. Dist. No. Six*, 898 P.2d 525, 532 (Colo.1995).

¶ 34 The Uniformity Clause provides, in relevant part:

> Each property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax.

Colo. Const. art. X, § 3(1)(a).

¶ 35 This section "applies only to ad valorem taxes and requires the burden of such taxation to be uniform on the same class of property within the jurisdiction of the authority levying the tax." *Jensen v. City & Cnty. of Denver*, 806 P.2d 381, 384 (Colo. 1991) (citation, quotation, and emphasis omitted). This Court's interpretation of the Uniform Taxation Clause in *Jensen* provides the most natural reading of the provision's directive that taxes should be uniform on all property "located within the territorial limits of the authority levying the tax." Colo. Const. art. X, § 3(1)(a).

¶ 36 Thus, the Uniformity Clause limits its blanket uniformity requirement by requiring uniformity only within "the territorial limits of the authority levying the tax." *Id.*; *see Jensen*, 806 P.2d at 385. This territorial qualification speaks to the distinction at issue in this case. Qwest, as a public utility, is assessed centrally under the territory set forth in section 39–4–102—the entire state. *See United Parcel Serv., Inc. v. Huddleston*, 981 P.2d 223, 227 (Colo.App.1999) ("Because the service provided [by public utilities involves] ownership or operation of property interests that extend through several taxing districts, a method for fairly determining the value of the property and allocating it to the districts is set forth under [section] 39–4–102."). In contrast, cable companies are assessed in a different territory, the county, pursuant to section 39–1–103(5)(a). *See Bd.*

*of Assessment Appeals v. E.E. Sonnenberg & Sons, Inc.*, 797 P.2d 27, 33 (Colo.1990) ("The determination of the valuation of most commercial property . . . begins with the county assessor's determination of the property's actual value."). The Uniform Taxation Clause therefore does not require the General Assembly to tax Qwest in the same manner that it taxes cable companies because public utilities and cable companies are assessed within different territorial limits. Thus, Qwest cannot state a claim under the Uniform Taxation Clause because the plain language of the provision permits different assessments within different territories. As such, the trial court properly dismissed Qwest's complaint as a matter of law, and the court of appeals properly affirmed that dismissal.

¶ 37 We hold that Qwest's inability to obtain either the intangible property exemption or the cost cap valuation method does not violate Qwest's rights under the plain language of the Uniform Taxation Clause of the Colorado Constitution.

### IV. Conclusion

¶ 38 The intangible property exemption and the cost cap valuation method do not apply to public utilities like Qwest. Nor do the disparate valuation methods for public utilities and cable companies violate Qwest's constitutional guarantee to equal protection or the Colorado Constitution's Uniform Taxation provision. Qwest has not stated a claim upon which relief could be granted. We accordingly affirm the decision of the court of appeals upholding the trial court's dismissal of Qwest's complaint.

Justice EID dissents, and Justice BOATRIGHT joins in the dissent.

Justice COATS does not participate.

Justice EID, dissenting.

¶ 1 Today the majority affirms the dismissal of Qwest's equal protection claim without a single piece of evidence having been introduced, or a single fact having been found. Indeed, the majority is so certain that the disparate tax treatment of Qwest is supported by a rational basis that it needs no

such facts or evidence, or even argument by the Department of Property Tax ("DPT"), which offered none of the rationales adopted by the majority for affirming the dismissal of the claim. The question here is not whether Qwest *will* prevail on its equal protection claim—admittedly a tough hill to climb—but whether it *might*, if given the opportunity to develop a factual record supporting its claim. Because I would give Qwest that opportunity, I respectfully dissent from the majority's opinion affirming the dismissal of its complaint.

¶ 2 Significantly, DPT does not challenge Qwest's assertion that its property tax burden is higher than that borne by its cable company competitors that provide the same services. The only question, then, is whether there is a rational basis to support that disparate treatment. *Armour v. City of Indianapolis*, —— U.S. ——, ——, 132 S.Ct. 2073, 2079–80 (2012). The majority finds that there is—primarily based on the fact that Qwest enjoys certain "benefits" as a public utility. Maj. op. at 223. But the majority makes no connection between such "benefits" that Qwest may receive as a public utility and the higher property taxes it pays. And indeed it cannot, because there has been no factual development in the case. As the court of appeals properly observed, "[w]e agree that whether the overall economic impact of the regulatory structure favors Qwest ... can be decided only by the trial court after creating an evidentiary record." *Qwest Corp. v. Colo. Div. of Prop. Tax*, —— P.3d ——, ——, 2011 WL 3332876 (2011). For example, as the court of appeals pointed out, Qwest alleges that "it derives no net benefit from the regulatory structure"—that is, from its guaranteed reasonable rate of return—because, as a public utility, it is obligated to provide service in "unprofitable areas." *Id.* n.10. The court of appeals thus "decline[d] to decide whether the definitional and regulatory differences between public utilities and non-utilities sufficiently implicate tax policy to satisfy the rational basis test." *Id.*

¶ 3 For its part, the majority, undeterred by the lack of factual development in this

regard, simply makes the bare assumption that the benefits Qwest receives justify a higher tax burden. But this rationale proves too much, as it would justify placing any property tax burden on Qwest, no matter how high. In my view, it is hardly rational to give DPT limitless authority to tax Qwest's property without having any idea of whether the benefits it receives as a public utility, if any, could be tied to tax policy. Significantly, while DPT mentions in passing that Qwest receives benefits as a public utility, it does not offer this as a rationale for justifying the disparate treatment; this "benefits" justification is of the majority's own creation.

¶ 4 The majority's other proffered rationales fare no better. It posits that "[t]he General Assembly may have sought to encourage local cable companies' competitive foray into the telecommunication market against public utilities," or perhaps it may have "determined that any inequity is on-balance insignificant" because cable companies' property that is related to telephone service is assessed in the same matter as Qwest's property. Maj. op. at 223. Significantly, however, these rationales—which again are not offered by DPT—suggest that the General Assembly considered how public utilities were treated for property tax purposes vis-à-vis cable companies and made a rational decision to subject cable companies to more favorable treatment. But as DPT appears to concede, this sort of rational decision did not happen, as the cable companies came into existence long after the General Assembly subjected public utilities to central assessment. There is no question that the General Assembly has wide latitude in making taxing choices. *See Armour*, —— U.S. at ——, 132 S.Ct. at 2080 (noting that "legislatures have especially broad latitude in creating" tax distinctions). But it is difficult to ascribe to the legislature a rational policy choice it could not have made under the circumstances. *See id.* at 2081 (describing "the nature of the line-drawing choices that confronted" a municipality in deciding to stop collecting a particular tax).[3]

3. Nor does the majority embrace the court of appeals' ultimate rationale—namely, that the

doctrine of administrative convenience justifies subjecting Qwest to disparate tax treatment.

¶ 5 The majority correctly acknowledges that motions to dismiss are disfavored, and dismissal on this ground is proper only where "it appears beyond a doubt that a plaintiff can prove no set of facts in support of her claim which would entitle her to relief." Maj. op. at 221 (quoting *Pub. Serv. Co. v. Van Wyk*, 27 P.3d 377, 385–86 (Colo.2001)). Indeed, the U.S. Supreme Court has recognized the crucial importance of factual records when differentiating between two cases in which equal protection challenges to similar tax statutes came out differently. *See Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 109–10, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) (comparing *Allegheny Pittsburgh Coal Co. v. Comm' n of Webster Cty.*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989), and *Nordlinger v. Hahn*, 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)); *see also Armour*, —— U.S. at ——, 132 S.Ct. at 2081–82 (describing in detail the "facts" that led a municipality to stop collecting a particular tax). The difference between these two cases was that "Allegheny Pittsburgh was the rare case where the facts precluded any plausible inference that the reason for the unequal assessment practice was to achieve the benefits of [the desired] tax scheme." *Fitzgerald*, 539 U.S. at 110, 123 S.Ct. 2156 (quoting *Nordlinger*, 505 U.S. at 16–17, 112 S.Ct. 2326). I am not as confident as the majority that the disparate treatment in question here is so obviously rational that factual development should be precluded. Accordingly, I would reverse the court of appeals' decision and remand to the trial court with instructions to deny DPT's motion to dismiss. I therefore respectfully dissent.

I am authorized to state Justice BOAT-RIGHT joins in this dissent.

Maj. op. at 223–24. I take from this that the majority did not find this rationale persuasive, and I agree. Significantly, DPT must have also found the rationale to be relatively unconvincing, as it barely mentions it in its submissions to us.