COLORADO COURT OF APPEALS
 2016 COA 64
 
 

Court of Appeals No. 15CA0288
City and County of Denver District Court No. 13CV33794 
Honorable Herbert L. Stern, III, Judge

Colorado Insurance Guaranty Association,
Plaintiff-Appellee and Cross-Appellant, 
v.
Sunstate Equipment Company, LLC,
Defendant-Appellant and Cross-Appellee. 

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE WEBB
J. Jones and Booras, JJ., concur
Announced April 21, 2016 

Harris, Karstaedt, Jamison & Powers, P.C., Heather A. Salg, Englewood, Colorado, for Plaintiff-Appellee and Cross-Appellant
The Overton Law Firm, Thomas J. Overton, Richard J. Gleason, Denver, Colorado; DLA PIPER LLP, Mark A. Nadeau, Phoenix, Arizona, for Defendant-Appellant and Cross-Appellee
¶1       When an insurer becomes insolvent and liquidation of its assets does not produce sufficient funds to pay claims, should the loss be borne by first party insureds or third party claimants? The General Assembly has created a guaranty association to pay the covered claims of an insolvent insurer. But then, after payment to a third party claimant, does the loss stop at the association or return to the first party insured? This opinion concludes that under the applicable statutes, a high-net-worth, first party insured must bear the loss.
¶2       In this recoupment action under section 10-4-511(4)(a)(I), C.R.S. 2015 (net worth provision), the trial court entered summary judgment in favor of plaintiff Colorado Insurance Guaranty Association (CIGA) and against defendant Sunstate Equipment Company, LLC (Sunstate), for the workers’ compensation benefits that CIGA had paid to a Sunstate employee. CIGA paid the benefits after Sunstate’s workers’ compensation insurer became insolvent and was liquidated. The court allowed Sunstate an offset based on liquidation proceeds paid to CIGA and refused to award CIGA its attorney fees incurred in connection with the employee’s claim.
¶3       Sunstate appeals on four grounds:

 the net worth provision is unconstitutional;
 
 
 the immunity created by section 10-4-517, C.R.S. 2015 (immunity provision), constitutes unconstitutional special legislation, and the trial court erred in holding that it bars Sunstate from raising affirmative defenses based on CIGA’s alleged mishandling of the employee’s claim;
 
 
 the trial court erred in declining to require CIGA to show that it had reviewed the applicable insurance policy to determine the "covered benefits" to which the employee was entitled; and
 
 
 the trial court miscalculated the offset.

¶4       As to the constitutional issues — undecided questions in
Colorado — we discern no violation of equal protection, procedural due process, or the prohibition against special legislation. As to the remaining issues, we conclude that under the immunity provision, the court properly barred Sunstate from raising its affirmative defenses; Sunstate’s argument that CIGA failed to prove covered benefits by reference to the insurance policy is without merit, but for other reasons, CIGA failed to establish that all amounts it paid to the employee were for a "covered claim"; and we need not address any error in calculating the offset because, as we decide in connection with CIGA’s cross-appeal, Sunstate is not entitled to any offset.
¶5       On cross-appeal, CIGA asserts that the trial court erred in:

 allowing Sunstate any offset for the liquidation proceeds and
 
 
 refusing to award CIGA its attorney fees.

¶6       We agree with CIGA that Sunstate was not entitled to an offset but conclude that CIGA cannot recover its attorney fees. 
SUNSTATE’S APPEAL
I. Facts
¶7       In 1997, Michael Menor, a Sunstate employee, was injured in the course and scope of his employment. Sunstate’s workers’ compensation insurer, Fremont Indemnity Company (Fremont), began paying benefits. In 2002, Fremont entered a final admission of liability (FAL) that Menor was permanently and totally disabled.
¶8       In 2003, Fremont became insolvent and liquidation began in California. CIGA took over Menor’s claim and began paying benefits to him. (Whether Sunstate received actual notice of CIGA’s payments before 2006 is unclear.) Then Sunstate became involved in Menor’s underlying workers’ compensation proceeding.
¶9       In 2010, Menor, CIGA, and Sunstate entered into an agreement to settle that case, subject to contingencies. In 2012, the settlement became final.
¶10       CIGA sought reimbursement from Sunstate under the net worth provision on the basis that in the year before Fremont had become insolvent, Sunstate’s net worth exceeded $25 million. Sunstate did not contest its net worth for that year, but declined to pay CIGA for other reasons. CIGA commenced an action in federal district court, which eventually was dismissed for lack of diversity jurisdiction. Then CIGA brought this action. By 2012, CIGA had received significant distributions from the Fremont liquidation.
¶11       Sunstate defended on the grounds that the net worth provision is unconstitutional; it is entitled to an offset from the Fremont liquidation distributions paid to CIGA; and CIGA’s recovery should be further reduced based on its mishandling of the underlying claim. In rulings on a series of motions, the trial court:

 upheld the constitutionality of the net worth provision;
 
 
 afforded Sunstate an offset of $78,271.17 based on comparing the amount CIGA had paid to Menor with the amounts CIGA had received from liquidation distributions as of 2012;
 
 
 held that the immunity provision precludes considering whether CIGA had mishandled the claim;
 
 
 after the offset, awarded CIGA $717,261.80 for benefits paid to Menor, plus statutory interest of $250,954.10; and
 
 
 declined to award CIGA any attorney fees incurred in connection with Menor’s claim.

II. Summary Judgment Standard of Review and Preservation 
The following principles inform our review:

 A trial court’s order granting or denying summary judgment is subject to de novo review. Westin Operator, LLC v. Groh, 2015 CO 25, ¶19.

 Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (quoting C.R.C.P. 56(c)).

 "All doubts must be resolved against the moving party; at the same time, the nonmoving party ‘must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts.’" Id. at ¶20 (citation omitted).

Other standards of review will be addressed for particular issues.
¶12       Because all of the issues being argued on appeal and cross-appeal were raised before the trial court, they are preserved. 
III. Constitutionality of the Net Worth Provision
¶13       Under the Colorado Insurance Guaranty Association Act, § 10-4-501 to -520, C.R.S. 2015 (Act or Colorado Act), CIGA "is a nonprofit, unincorporated legal entity" that provides "a means for insureds to recover on claims against insolvent insurers." Alexander v. Indus. Claim Appeals Office, 42 P.3d 46, 47 (Colo. App. 2001). It does so by stepping "into the shoes of the insolvent insurer to pay claims within the coverage and limits of the insurance policy." Id. The net worth provision allows CIGA to recoup these payments from some of an insolvent insurer’s insureds:
(4)(a) The association shall have the right to recover from the following persons the amount of any covered claim paid on behalf of such person pursuant to this part 5:
(I) Any insured whose net worth on December 31 of the year immediately preceding the date the insurer becomes an insolvent insurer exceeds twenty-five million dollars and whose liability obligations to other persons are satisfied in whole or in part by payments made under this part 5. An insured’s net worth on such date shall be deemed to include the aggregate net worth of the insured and all of its subsidiaries as calculated on a consolidated basis[.]
§ 10-4-511(4)(a)(I) (emphasis added).
¶14       Sunstate contends the net worth provision violates its rights to equal protection and procedural due process, as applied. Colorado courts have not addressed any similar contentions.
¶15       As described below, courts in other jurisdictions — with net worth statutes that, like Colorado’s, derive from the Post-Assessment Property and Liability Insurance Guaranty Association Model Act (Model Act), as proposed by the National Association of Insurance Commissioners — have uniformly upheld such statutes against constitutional challenges. We consider these opinions well-reasoned and rely on them in concluding that the net worth provision does not violate either equal protection or procedural due process. See Colo. Ins. Guar. Ass’n v. Menor, 166 P.3d 205, 214 (Colo. App. 2007) (looking to cases from other jurisdictions interpreting Model Act provisions as guidance).
A. Background
¶16       Because Fremont became insolvent in mid-2003, under the net worth provision Sunstate’s net worth was determined as of December 31, 2002. Sunstate agrees that it then had a net worth exceeding $25 million. Even so, according to the affidavit of Sunstate’s chief financial officer:

 "Sunstate’s net worth was well below $25 million by December 31, 2005, and throughout 2006"; a

 "Sunstate’s net worth also suffered from 2009-2011, during which time Sunstate’s liabilities far exceeded Sunstate’s assets as Sunstate’s business was highly dependent on the construction industry . . . ."

¶17       But after the trial court entered judgment for CIGA in 2014, Sunstate moved to stay the judgment pending appeal. In that motion, Sunstate asserted:
[T]here is no threat to CIGA that Sunstate will not be able to pay the Judgment in the event it loses on appeal. Sunstate is financially sound, and its most recent statement of net worth in the improving economy is approximately $160 million.
B. Equal Protection
 1. Standard of Review
¶18       "We review de novo a constitutional challenge to a statute." People v. Stotz, 2016 COA 16, ¶24.
¶19       The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Although the Colorado Constitution does not contain an identical provision, "it is well-established that a like guarantee exists within the constitution’s due process clause, Colo. Const. art. II, sec. 25, and that its substantive application is the same insofar as equal protection analysis is concerned." Qwest Corp. v. Colo. Div. of Prop. Taxation, 2013 CO 39, ¶22 (quoting Lujan v. Colo. State Bd. of Educ., 649 P.2d 1005, 1014 (Colo. 1982)).
¶20       Both parties agree that the rational basis test applies to an equal protection challenge of economic legislation such as the net worth provision. See People v. Diaz, 2015 CO 28, ¶25 (A court applies a rational basis test "where, as here, no traditionally suspect class is present, no fundamental right is at issue, and no other classification warrants review under strict or intermediate scrutiny.").
¶21       Under this test, "a statutory classification is presumed constitutional and does not violate equal protection unless it is proven beyond a reasonable doubt that the classification does not bear a rational relationship to a legitimate legislative purpose." Pace Membership Warehouse, Div. of K-Mart Corp. v. Axelson, 938 P.2d 504, 506 (Colo. 1997). In applying rational basis review, "we do not decide whether the legislature has chosen the best route to accomplish its objectives." People v. Dean, 2016 CO 14, ¶13. Instead, "[o]ur inquiry is limited to whether the scheme as constituted furthers a legitimate state purpose in a rational manner." Id.
 
2. Sunstate’s Constitutional Arguments
¶22       Sunstate asserts that two aspects of the net worth provision fail this rational basis test.
¶23       First, it argues that using a fixed date to determine net worth — December 31 of the year immediately preceding the date the insurer became insolvent — results in similarly situated insureds being treated differently because such a date fails to account for fluctuations in net worth during the years after the insurer became insolvent and the claim remains open. As indicated, between 2003 and 2012, while CIGA was paying Menor’s claim, Sunstate’s net worth fluctuated and sometimes was below $25 million. For purposes of this argument, Sunstate compares itself to an insured with a net worth that remained above $25 million.
¶24       Second, Sunstate argues that even assuming the $25 million classification was minimally rational when the net worth provision was enacted in 1999, because the provision fails to adjust for inflation, the classification no longer bears a rational relationship to a legitimate legislative purpose. Specifically, Sunstate explains that, by failing to adjust for inflation, "the legislature has allowed the net worth provision to apply to companies that they recognized in 1999 would find such losses unaffordable." For purposes of this argument, it does not identify a comparator.
¶25       Sunstate frames both of these challenges "as applied" rather than as facial challenges. Yet, the "distinction between a ‘facial’ and an ‘as applied’ equal protection challenge is not always clear cut." United Airlines v. Indus. Claim Appeals Office, 2013 COA 48, ¶30 (quoting City of Florence v. Pepper, 145 P.3d 654 (Colo. 2006)). And this distinction becomes even murkier as to Sunstate’s second argument, because the magnitude of the inflation effect changes over time: for Sunstate, the operative period is 1999 to 2003; for other insureds, the operative period is from 1999 to the present and beyond, unless and until the General Assembly acts to change the net worth provision.
¶26       When asserting an as-applied challenge, the party "contends that the statute would be unconstitutional under the circumstances in which the [party] has acted or proposes to act." Sanger v. Dennis, 148 P.3d 404, 410-11 (Colo. App. 2006). "The practical effect of holding a statute unconstitutional as applied is to prevent its future application in a similar context, but not to render it utterly inoperative." Dev. Pathways v. Ritter, 178 P.3d 524, 534 (Colo. 2008) (quoting Sanger, 148 P.3d at 410).
¶27       In contrast, a facial constitutional challenge is used when a party seeks "to render [a statute] utterly inoperative." Id. (quoting Sanger, 148 P.3d at 410). Under such challenges, a statute can be stricken using the rational basis test only "if there exists no reasonably conceivable set of facts to establish a rational relationship between the statute and a legitimate governmental purpose." Pace Membership Warehouse, 938 P.2d at 507. And "[s]imply because a statutory classification creates a harsh result in one instance does not mean that the statute fails to meet constitutionality requirements under the rational basis standard." Id.
 
¶28       Sunstate’s challenge based on the fixed date involves application of the net worth provision to particular circumstances, i.e., its fluctuating net worth after 2002. Thus, we agree that this challenge is "as applied." The lack of an adjustment for inflation, however, is not so clear. On the one hand, because lack of an adjustment will affect insureds differently, treating it as a facial challenge is problematic. On the other hand, Sunstate seeks to invalidate the net worth provision in its entirety — the hallmark of a facial challenge. See Doe v. City of Albuquerque, 667 F.3d 1111, 1127 (10th Cir. 2012) ("[A] facial challenge is just that — a challenge to the terms of the statute, not hypothetical applications.").
¶29       We need not resolve this question because whether the challenge is facial or as applied, a statute will not be held unconstitutional "simply because distinctions created by the statute are not made with mathematical nicety." Pace Membership Warehouse, 938 P.2d at 507; see Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."). Rather, "the problems of government being practical ones, equal protection will tolerate ‘a rough accommodation of variant interests.’" Pace Membership Warehouse, 938 P.2d at 507 (quoting Dawson ex rel. McKelvey v. Pub. Emps.’ Ret. Ass’n, 664 P.2d 702, 708 (Colo. 1983)). One such interest "is the government’s interest in its own efficient and effective operation." Qwest Corp. v. Colo. Div. of Prop. Taxation, 310 P.3d 113, 121 (Colo. App. 2011), aff’d, 2013 CO 39.
3. Fixed Date for Determining Net Worth
¶30       Sunstate asserts that the net worth provision is unconstitutional as applied "because Sunstate’s net worth declined below the net worth threshold before CIGA sought reimbursement for Menor’s claims." According to Sunstate, the net worth provision is not rationally related to a legitimate legislative purpose because it ignores the financial condition of an insured when "CIGA makes a payment on the insured’s behalf." We conclude that Sunstate has not shown beyond a reasonable doubt how the $25 million threshold, as applied to it, lacks a rational relationship to a legitimate legislative purpose.
¶31       To begin, the purposes of the Act are
to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.
§ 10-4-502, C.R.S. 2015; see also § 10-4-505, C.R.S. 2015 (The Act "shall be liberally construed to effect the[se] purposes . . . .").
¶32       But CIGA does not receive government funding. And the private funding available to CIGA under the Act is limited. Specifically, "[n]o member insurer may be assessed in any year on any account an amount greater than two percent of that member insurer’s net direct written premiums for the preceding calendar year on the kinds of insurance in the account." § 10-4-508, C.R.S. 2015. In light of this limitation, and as explained in Menor, 166 P.3d at 214, various provisions of the Act — including the net worth provision — "further [the Act’s] purposes by conserving the resources available to CIGA to pay claimants and policyholders." According to the division, such provisions "address the problem of conserving resources to protect the financial stability of CIGA." Id.
 
¶33       Two types of net worth provisions are found in Colorado’s Act and the Model Act — one for recoupment claims, as here, and the other for first party claims, see § 10-4-503(4)(b)(II), C.R.S. 2015 (A covered claim does not include "[a] first party claim by an insured whose net worth exceeds ten million dollars."). But in either context, use of a net worth limitation preserves CIGA’s assets, albeit in slightly different ways. Section 10-4-503(4)(b)(II) excludes first party claims against CIGA by an insured with a high net worth; section 10-4-511(4)(a)(I) allows CIGA to recover payments from even higher net worth insureds.
¶34       Other jurisdictions analyzing the constitutionality of net worth provisions have upheld both types of provisions. Yet, because the underlying purpose of a net worth provision is shifting losses from insolvency to higher net worth insureds remains the same — whether it involves a first party claim or a recoupment claim — we look to both lines of authority for guidance.
¶35       In Rhode Island Insurers’ Insolvency Fund v. Leviton Manufacturing Company, Inc., 716 A.2d 730, 734-35 (R.I. 1998), the court analyzed a recoupment provision and explained that by providing "for recovery of payments, as opposed to an outright denial of coverage," the legislature intended "to deliver benefits to those in immediate need . . . without regard to a company’s net worth . . . ." And the legislature’s "decision to include a recoupment provision applicable to companies with net worths in excess of $50 million . . . ensures that sufficient funds will be available to accomplish this important objective." Id. at 735.
¶36       In Cresswood Farm, Inc. v. Illinois Insurance Guaranty Fund, No. 03 C 7051, 2004 WL 838037, at *4 (N.D. Ill. Apr. 19, 2004), the court analyzed a net worth provision applicable to both first party and recoupment claims. The court found that "[t]he rationale [sic] bases identified . . . are not so ‘patently, wildly, [or] totally irrational’ as to render the affiliate net worth exclusion unconstitutional." Id. It explained that "[t]he Act is a benefit program established by the Illinois legislature [and i]t was not intended to render the Fund absolutely liable to policyholders due to the insolvency of their insurance companies." Id. Therefore, the net worth exclusion "would assist in weeding out those less likely in need." Id.
 
¶37       And in Borman’s, Inc. v. Michigan Property & Casualty Guaranty Association, 925 F.2d 160, 162 (6th Cir. 1991) — which involved an equal protection challenge to a first party net worth provision — the court explained that the "purpose of the net worth calculation was to ensure that the Association’s limited funds go to those insureds who are least able to absorb an unexpected loss due to the insolvency of an insurer." See also Ga. Insurers Insolvency Pool v. Se. Atl. Cargo Operators, Inc., 440 S.E.2d 254, 256 (Ga. Ct. App. 1994) ("Because . . . resources are limited, however, the Legislature determined that parties with assets of over $3 million should not be able to make claims against the fund, because they are in a position to better bear the inevitable loss themselves.").
¶38       The equal protection challenge addressed in Borman’s was whether "use of a company’s net worth to determine that company’s ability to absorb loss was rational." 925 F.2d at 162. In concluding that it was, the court acknowledged that net worth was "an imperfect measure in that at times there can be real or perceived inequalities." Id. at 163 (citation omitted). Yet, it also recognized that net worth was "certainly . . . an indicator of the capacity to absorb loss." Id. (citation omitted). Ultimately, the court held that the "test for constitutional purposes is not whether the legislative scheme is imperfect, but whether it is wholly irrational." Id. Thus, the "legislature’s use of net worth as a proxy for a more complex calculation" was rational. Id.; see also Oakland Cty. Bd. of Rd. Comm’rs v. Mich. Prop. & Cas. Guar. Ass’n, 550 N.W.2d 856, 859 (Mich. Ct. App. 1996) ("[W]ere we to address the merits of plaintiff’s equal protection challenge, we would adopt as our own the analysis of [Borman’s].").
¶39       Sunstate correctly points out that these cases address only using a net worth provision — which Sunstate does not challenge — rather than using a fixed date to determine net worth. But this distinction does not make their analyses any less persuasive. Both relying on a net worth test — whether to limit first party claims against a guaranty association or to allow recoupment by such an association for benefits paid to a third party — and using a fixed date in its determination further the same objective of preserving assets, albeit in imperfect ways. Thus, the analyses in these cases are informative here — especially as related to the administration of net worth provisions.
¶40       Recall that in Borman’s the court explained that "the legislature may consider the administrative difficulties of individual eligibility determinations in making a substantive policy determination that limited resources would not be well spent in making individual determinations." 925 F.2d at 163-64 (quoting Weinberger v. Salfi, 422 U.S. 749, 784 (1975)). Likewise, requiring CIGA to determine the fluctuating net worth of an insured annually so long as a claim remained open would involve multiple determinations. (Sunstate recognizes that workers’ compensation payments may "continue for years after the insurer’s insolvency.") Such annual determinations, which could be complex if public financial information was unavailable because the insured was a privately held entity, would consume CIGA’s resources. And even more resources would be consumed if such an insured contested CIGA’s net worth determination, especially if the insured did so in multiple years. See Qwest Corp., 310 P.3d at 121 ("The objective of operating efficiently and effectively can . . . spur the government to conserve its limited resources, which is also a legitimate reason for creating classifications.").
¶41       Thus, as recognized in Borman’s, "the legislature conceivably may have concluded that the ease of administration and the preservation of limited fund resources for legitimate claimants justified the adoption of the rough net worth standard rather than a more precise mechanism of individual determination." 925 F.2d at 164; see also Weinberger, 422 U.S. at 783 ("The administrative difficulties of individual eligibility determinations are without doubt matters which Congress may consider when determining whether to rely on rules which sweep more broadly than the evils with which they seek to deal.").
¶42       To be sure, requiring CIGA to revisit net worth annually would be more exact. And even more exact would be determining it quarterly. But "[l]egislatures need not be as exacting." Cresswood Farm, 2004 WL 838037, at *4. Rather, "[s]o long as the distinction drawn by the [legislature] is rationally related to some governmental interest, the Equal Protection Clause is not offended simply because the line which is drawn is imperfect." Duran v. Indus. Claim Appeals Office, 883 P.2d 477, 483 (Colo. 1994); see also Culver v. Ace Elec., 971 P.2d 641, 653 (Colo. 1999) ("[T]he fact that the legislature’s line-drawing may be imperfect, may result in some inequity, or could have been tailored more precisely, does not warrant a reviewing court to strike down the statute.").
¶43       Beyond preservation of assets and administrative considerations, one final rationale has been recognized in upholding net worth provisions: "larger, more sophisticated insureds can protect themselves by being more selective in deciding from whom they buy insurance." Kent M. Forney, Insurer Insolvencies and Guaranty Associations, 43 Drake L. Rev. 813, 825 (1995); see Borman’s, 925 F.2d at 163 ("[T]he net worth provision was intended to avoid affording those individuals and corporations with large wealth the same benefits under the Association’s insolvency fund as unsophisticated individuals with modest means.") (citation and alterations omitted); see also Cresswood Farm, 2004 WL 838037, at *3 ("[T]he high net worth insured is a sophisticated buyer who ought to be able to buy insurance intelligently so that it is not insured by an unsound insurer.") (citation omitted); Minn. Ins. Guar. Ass’n v. Integra Telecom, Inc., 697 N.W.2d 223, 229 (Minn. Ct. App. 2005) (The net worth provision "was intended to allow [guaranty association] the right to recover amounts paid on behalf of a company with a net worth greater than $25 million, who are presumably sophisticated insurance purchasers, in order to ensure that the [association’s] limited funds would go to pay the claims of those insureds without substantial assets."). Considering high net worth as a proxy for sophistication supports using a fixed date for determining net worth before insolvency of the insurer has occurred.
¶44       Given all of this, we conclude that Sunstate has not proven beyond a reasonable doubt how use of a fixed date to determine net worth is unconstitutional as applied to it.
4. Lack of an Inflation Adjustment
¶45       Nor has Sunstate shown that the net worth provision is unconstitutional because it fails to adjust the $25 million threshold for inflation.
¶46       Sunstate cites no authority, and we have not found any in Colorado, holding that a statute with an economic test lacks a rational basis solely because it fails to adjust for inflation. In contrast, other jurisdictions have upheld such statutes, despite lack of inflation adjustments. See, e.g., Nat’l Org. for Marriage v. McKee, 649 F.3d 34, 61 (1st Cir. 2011) ("We thus reject NOM’s argument that the $100 [campaign contribution] threshold is unconstitutional simply because it is static."); In re Cao, 619 F.3d 410, 423 (5th Cir. 2010) (A statue will not be held unconstitutional for "failure to index for inflation alone . . . , Congress’ failure to engage in such fine tuning does not invalidate the legislation.") (citation omitted); Zauflik v. Pennsbury Sch. Dist., 104 A.3d 1096, 1123 (Pa. 2014) ("While we have genuine sympathy for appellant’s individual situation (and particularly in light of the fact that the amount of the cap has not been increased, or adjusted for inflation, in the thirty-six years since its adoption), we conclude that appellant has not shown that the classification . . . clearly, palpably and plainly violates equal protection principles.") (emphasis omitted).
¶47       As well, other jurisdictions have upheld insurance guaranty fund statutes using net worth provisions with varying thresholds. Compare Borman’s, 925 F.2d at 161 (Michigan law "excludes from the definition of covered claims, ‘obligations to . . . a person who has a net worth greater than 1/10 of 1% of the aggregate premiums written by member insurers in this state in the preceding calendar year.’") (citation omitted), with R.I. Insurers’ Insolvency Fund, 716 A.2d at 734 (Rhode Island law imposes a $50 million net worth threshold).
¶48       Thus, even if a $25 million net worth in 1999 equated to a lower number in 2002 — when Sunstate’s net worth was determined — the record does not show that this difference would be so great as to undercut the basic rationale of such a provision: treating high net worth insureds differently to conserve limited resources. See R.I. Insurers’ Insolvency Fund, 716 A.2d at 734 ("[A]lthough we acknowledge that our Legislature could very well have selected a higher net worth minimum, or some other criterion . . . a $50 million net worth threshold is reasonable and rationally related to the public purpose underlying the act.").
¶49       In other words, because the General Assembly could have chosen a lower threshold than $25 million, we cannot say that a de facto lower threshold in later years due to inflation lacks minimum rationality. Instead, "[i]t is up to the legislature and not this Court to decide whether its legislation continues to meet the purposes for which it was originally enacted," Verba v. Ghaphery, 552 S.E.2d 406, 412 (W. Va. 2001), and "[i]f the legislature finds that it does not, it is within its power to amend the legislation as it sees fit," id.
 
C. Procedural Due Process
¶50       Sunstate’s assertion that the net worth provision is "unconstitutional on grounds of procedural due process" also fails. 
1. Standard of Review and Law
¶51       As with equal protection, when reviewing for a procedural due process violation, "a statute is presumed constitutional and, therefore, the party challenging the statute must prove beyond a reasonable doubt that the statute is unconstitutional." Dewey v. Hardy, 917 P.2d 305, 308 (Colo. App. 1995).
¶52       "The essence of procedural due process, as guaranteed by Colo. Const. art. II, § 25, and the Fourteenth Amendment, is basic fairness and procedure." Id. It "protects an individual’s use and possession of property from arbitrary encroachment and minimizes substantially unfair or mistaken deprivations of property." Id.
 
¶53       To determine if a statute violates procedural due process, a court looks to the following three criteria:
First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved in the fiscal and administrative burdens that the additional or substitute procedural
requirement (sic) would entail.
Id. (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).
¶54       In general, a party’s right to procedural due process is met if the party receives prior notice and has an opportunity to be heard. Avalanche Indus., Inc. v. Indus. Claim Appeals Office, 166 P.3d 147, 150 (Colo. App. 2007). However, the protections offered by procedural due process "are not as stringent when a deprivation of property is involved as opposed to a deprivation of a personal liberty." Dewey, 917 P.2d at 308.
2. Analysis
¶55       Sunstate argues that the net worth provision violates procedural due process because it allowed CIGA to recover payments made on behalf of Fremont before Sunstate had been given actual notice that CIGA was making such payments. Sunstate’s supplemental brief admits that it had actual notice of Fremont’s insolvency by 2004, when it filed a claim in the liquidation. Even so, according to Sunstate, without prior notice of CIGA’s actions, it had no opportunity to challenge the amounts that CIGA had paid.[1]
¶56       Beginning with the first Eldridge factor, while Sunstate’s interests are affected, those interests are purely economic. See Whiteside v. Smith, 67 P.3d 1240, 1249 (Colo. 2003) ("[O]ne of the important factors to consider when evaluating the nature of the private interest that will be affected by official action is the ‘degree of potential deprivation.’") (quoting Eldridge, 424 U.S. at 341). True enough, economic interests can be very significant to some persons adversely affected, see, e.g., Goldberg v. Kelly, 397 U.S. 254, 264 (1970) ("[T]ermination of [welfare] aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits."). But Sunstate admittedly had a net worth exceeding $25 million as of year-end 2002. Thus, the first factor does not weigh significantly in Sunstate’s favor.
¶57       Turning to the second Eldridge factor, we discern only limited risk of an erroneous deprivation of Sunstate’s interests, for the following four reasons.
¶58       First, under the Act, CIGA "steps into the shoes of the insolvent insurer to pay claims within the coverage and limits of the insurance policy." Alexander, 42 P.3d at 47. Here, Fremont had filed a "[FAL] for permanent total disability benefits and medical benefits" as to Menor. Menor, 166 P.3d at 208. Thus, some of CIGA’s obligations under the Act were based on the FAL, which predated Fremont’s insolvency and represented the action of Sunstate’s agent, acting within the scope of its actual authority.
¶59       Second, the trial court found that "Sunstate had the opportunity . . . to represent its interests before the worker’s compensation tribunal, and at that time was afforded notice and a hearing." Sunstate does not dispute this finding. Nor could it, because Sunstate, as the employer, had the right to "contest any future claims for medical treatment on the basis that such treatment is unrelated to the industrial injury or occupational disease." Grover v. Indus. Comm’n, 759 P.2d 705, 712 (Colo. 1988); see also Snyder v. Indus. Claim Appeals Office, 942 P.2d 1337, 1339 (Colo. App. 1997).
¶60       Sunstate could also seek to reopen Menor’s case and contest past overpayments under section 8-43-303, C.R.S. 2015. Reopening is discretionary and may be permitted if the requesting party establishes "fraud, an overpayment, an error, a mistake, or a change in condition." § 8-43-303(1), (2)(a); see Berg v. Indus. Claim Appeals Office, 128 P.3d 270, 272 (Colo. App. 2005).
¶61       Third, even if CIGA did not provide Sunstate with actual notice that it was paying Menor’s claim until 2006, we agree with the trial court that based on the Act, of which Sunstate is presumed to have knowledge, Sunstate had constructive notice that CIGA would take over the claim when Fremont became insolvent in 2003. See Hicks v. Joondeph, 232 P.3d 248, 251 (Colo. App. 2009) (No violation of procedural due process where the party "had constructive notice of the statute allowing the judgment to be revived and the lien continued."); cf. Lombard v. Colo. Outdoor Educ. Ctr., Inc., 187 P.3d 565, 572-73 (Colo. 2008) (general contractor presumed to have knowledge of building code). Sunstate knew that Fremont had been paying Menor’s disability and medical benefits — and that under the Act, CIGA would continue to do so. See Menor, 166 P.3d at 208.
¶62       Fourth, and for the same reasons, Sunstate also had constructive notice that under the Act, its net worth would be determined as of December 31, 2002; on that basis it could be subject to a recoupment claim by CIGA. And in any event, Sunstate could challenge CIGA’s net worth determination as of that date later when CIGA sought recoupment of its payments under the Act. Sunstate has done so — not on its net worth at that time but because the net worth determination should not be based on a fixed date.
¶63       In sum, considering both actual and constructive notice, at any time after Fremont became insolvent in mid-2003, Sunstate could have contacted CIGA or the division of workers’ compensation to ascertain the status of benefits being paid to Menor. Then it could have challenged — retrospectively or prospectively — any benefits that it believed were not reasonable and necessary. For these reasons, we conclude that the erroneous determination risk is low.
¶64       The final Eldridge factor presents a closer question. Requiring CIGA to provide actual notice to the insured when it takes over a claim and begins paying benefits would be a minimal burden. But continuing to provide the insured with notice of each benefit paid would be a significant burden. Thus, at best Sunstate has the stronger side of the Eldridge analysis as to only one factor.
¶65       For these reasons, we conclude that Sunstate has not shown how the net worth provision violates its right to procedural due process. See Alabed v. Crawford, No. 1:13-CV-2006-SKO, 2015 WL 1889289, at *22 (E.D. Cal. Apr. 24, 2015) ("Although the third factor weighs in favor of additional process in every I–130 petition, it is outweighed here by the weight of the first two factors.").
IV. Immunity and Affirmative Defenses
¶66       The immunity provision provides:
There shall be no liability on the part of, and no cause of action of any nature shall arise against, any member insurer, the association or its agents or employees, the board of directors, or the commissioner or his representatives for any action taken by them in the performance of their powers and duties under this part 5.
§ 10-4-517 (emphasis added).
¶67       Sunstate raises two contentions as to this provision. Both are issues of first impression in Colorado. First, the immunity provision should be stricken as unconstitutional special legislation. Second, even if the provision is valid, the trial court erred in relying on it to bar Sunstate’s affirmative defenses. We reject both of these contentions.
A. Special Legislation
1. Law
¶68       Colorado Constitution article V, section 25 prohibits the enactment of special legislation:
The general assembly shall not pass . . . special laws . . . for limitation of civil actions . . . [or] granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. . . .
¶69       Judicial review of a statute under article V, section 25 "focuses on whether legislation creates valid classifications, and, if so, whether the classifications are reasonable and rationally related to a legitimate public purpose." City of Greenwood Village v. Petitioners for Proposed City of Centennial, 3 P.3d 427, 441 (Colo. 2000); see Snook v. Joyce Homes, Inc., 215 P.3d 1210, 1214 (Colo. App. 2009) ("If the classification is reasonably related to a legitimate government purpose, the statute does not violate article V, section 25.").
¶70       Like the challenges to the net worth provision, we review a special legislation challenge de novo, following the same principles. City of Greenwood Village, 3 P.3d at 441. A statute violates the prohibition against special legislation if it creates an illusory class or a class "that is drawn so that it will never have any members other than those targeted by the legislation." Snook, 215 P.3d at 1214 (citation omitted).
2. Analysis
¶71       Sunstate devotes just half a page to this issue. It argues only that the immunity provision "applies to a single entity — CIGA — and thus, it is unconstitutional and no further inquiry is necessary."
¶72       This argument is unpersuasive because the immunity provision also applies to "any member insurer," as well as to "the [Colorado Insurance] commissioner or his representatives." Thus, it does not create an illusory class of one. See People v. Canister, 110 P.3d 380, 384 (Colo. 2005) ("Our special legislation precedent illustrates that, even when the legislature had a specific entity in mind when drafting the legislation, the class created by the legislation is not illusory if it could include other members in the future."); In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S-1005, 814 P.2d 875, 887 (Colo. 1991) ("[W]e cannot say . . . that no entity other than United Airlines will ever meet the statutory criteria set forth in H.B. 1005.").
¶73       Having concluded that the immunity provision "affects a genuine class, we [next] address whether the classification is reasonable." Canister, 110 P.3d at 383.
¶74       In Mosley v. Industrial Claim Appeals Office, 119 P.3d 576, 580 (Colo. App. 2005), a division of this court addressed whether workers compensation penalties could be assessed against CIGA under the immunity provision. In holding CIGA immune, the division explained that "requiring CIGA to pay penalties for postinsolvency acts would result in increased premiums for individual policyholders and depletion of CIGA funds to pay for covered claims of all claimants whose insurers had become insolvent." Id. As a result, the division concluded that providing CIGA with immunity furthers the purpose of the Act, which is to avoid "excessive delay in payment and financial loss to claimants or policyholders because of the insolvency of an insurer." Id. at 579 (citing § 10-4-502).
¶75       We agree with Mosley that providing CIGA with immunity is rationally and reasonably related to a legitimate government purpose under the Act. Therefore, we conclude that Sunstate has not shown beyond a reasonable doubt how the immunity provision violates the constitutional ban on special legislation.
B. Affirmative Defenses
1. Background
¶76       Sunstate filed a counterclaim alleging that CIGA had negligently failed to "exercise reasonable care and properly oversee and manage Menor’s claims for reimbursements." It sought "an award of damages," and alleged that "[b]ecause of CIGA’s negligence, Sunstate should not be required to reimburse to CIGA any of the monies paid to Menor."
¶77       Sunstate also asserted affirmative defenses that CIGA had mishandled Menor’s claim:

 "CIGA has failed to mitigate its damages by, among other things, failing to exercise reasonable claims handling practices." 

 "[L]osses or damages were an inherent risk CIGA took in making payments to Menor and significantly delaying its request for reimbursement from Sunstate."

 "CIGA’s purported injury . . . was incurred as a result of its failure to take reasonable steps to mitigate such injury, loss or damages."

¶78       Citing the immunity provision, the trial court held that Sunstate was "precluded from raising affirmative defenses or counterclaims against CIGA." On appeal, Sunstate only challenges the barring of its affirmative defenses. We conclude that these defenses were properly barred.
2. Standard of Review
¶79       Whether the immunity provision bars Sunstate from asserting affirmative defenses that CIGA mishandled Menor’s claim is a question of statutory interpretation subject to de novo review. Granite State Ins. Co. v. Ken Caryl Ranch Master Ass’n, 183 P.3d 563, 567 (Colo. 2008).[2]
¶80       "[A] statute has meaning according to the legislative intent expressed in the language actually chosen by the legislature." Benefield v. Colo. Republican Party, 2014 CO 57, ¶11. "Should that language admit of more than one reasonable understanding, it is considered to be ambiguous and must be construed." Id.
 
¶81       When examining a statute’s wording, "[w]e do not presume that the legislature used language idly and with no intent that meaning should be given to its language." Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist., 109 P.3d 585, 597 (Colo. 2005) (citation omitted), superseded by statute as stated in St. Jude’s Co. v. Roaring Fork Club, L.L.C., 2015 CO 51. Rather, "we strive to interpret statutes in a manner that avoids rendering any provision superfluous." Qwest Corp., ¶16.
¶82       Again, under section 10-4-505, the immunity provision "shall be liberally construed to effect the purposes" of the Act. As well, because the immunity provision also derives from the Model Act, we may look to cases from other jurisdictions interpreting it as guidance. See Menor, 166 P.3d at 214.
¶83       In Potvin v. Lincoln Service & Equipment Company, 6 A.3d 60, 68 (Conn. 2010), for example, the court explained that the language of a similar immunity provision "can be broken into two parts." One part "limits the extent of the immunity granted" to certain actions of an association. Id. And the other part "provides a general rule vesting the association with immunity from ‘liability’ and any ‘cause of action.’" Id.
 
3. Analysis
¶84       According to Sunstate, the trial court misapplied the immunity provision because it does not include an "express reference to affirmative defenses or even a suggestion that the statute intends to limit" such defenses.
¶85       True enough, the immunity provision does not use the term "affirmative defenses." But instead of dealing with labels, to resolve whether the immunity provision bars Sunstate’s affirmative defenses, we must first determine if the affirmative defenses are based on "action taken by [CIGA] in the performance of their powers and duties under [the Act]." § 10-4-517. If so, then we must determine whether the practical effect of allowing Sunstate to assert the affirmative defenses would result in a "liability" to CIGA.
a. Action Taken by CIGA Under the Act
¶86       To begin, the immunity conferred by section 10-4-517 extends only to liability that arises from action taken by CIGA in the performance of its powers and duties. Those powers and duties appear in section 10-4-508, and include that CIGA "shall":

 "pay the full amount of any covered claim arising out of workers’ compensation policies," section 10-4-508(1)(a)(I)(C);

 "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent," section 10-4-508(1)(b);

 "[i]nvestigate claims brought against the association and adjust, compromise, settle, and pay covered claims to the extent of the association’s obligation, and deny all other claims, and may review settlements, releases, and judgments to which the insolvent insurer or its insureds were parties to determine the extent to which such settlements, releases, and judgments may be properly contested," section 10-4-508(1)(d);

 "[h]andle claims," section 10-4-508(1)(f), "[a]llocate claims paid and expenses incurred," and "assess member insurers," section 10-4-508(1)(c).

(Emphasis added.)
¶87       Courts interpreting immunity provisions under the Model Act have held that an association’s immunity is "restricted to actions incidental to claims adjustment, processing and payment." Hudson Envtl. Servs., Inc. v. N.J. Prop.-Liab. Ins. Guar. Ass’n, 858 A.2d 39, 54 (N.J. Super. Ct. Law Div. 2004); see Boettcher v. Mont. Guar. Fund, 154 P.3d 629, 635 (Mont. 2007) (The immunity provision protects an association from "liability aris[ing] out of [the association’s] actions in the performance of its duties to pay covered claims.").[3]
¶88       The affirmative defenses asserted by Sunstate all relate to CIGA’s alleged mishandling of Menor’s claim — that it failed to mitigate its damages and unreasonably delayed in requesting reimbursement. And by any fair account, such actions fall squarely within the meaning of "action[s] taken . . . in the performance of [CIGA’s] performance of [its] powers and duties." See § 10-4-517; Mosley, 119 P.3d at 579 ("[T]he plain and unambiguous language of [the immunity provision] provides absolute immunity to CIGA from liability of any kind for any action taken by CIGA in the performance of its powers and duties, including the handling of claims.") (emphasis added).
¶89       Next, we consider whether allowing Sunstate to assert these affirmative defenses would result in a liability to CIGA.
b. Liability
¶90       To be sure, cases addressing liability under either the Colorado Act or the Model Act generally involve the imposition of penalties or sanctions against an association. See Mosley, 119 P.3d at 579 ("CIGA is statutorily immune from liability for penalties for its own alleged misconduct."); see also Potvin, 6 A.3d at 68 ("[T]he term ‘liability’ . . . encompasses statutory sanctions imposed by a workers’ compensation commissioner."). In these cases, a sanction or penalty constitutes a liability because it obligates an association to pay money in addition to the amount of the claim.
¶91       Here, in contrast, Sunstate seeks only to limit CIGA’s recovery under the net worth provision. Even so, interpreting the immunity provision liberally — as we must — we conclude that permitting Sunstate to assert that CIGA mishandled Menor’s claim would result in a liability to CIGA, for the following four reasons.[4]
¶92       First, because the Act does not define "liability," this term must "be read in context and construed according to the rules of grammar and common usage." § 2-4-101, C.R.S. 2015. "The meaning of the word ‘liabilities’ has been given many times by judicial decisions, as well as by lexicographers. It is a broad term . . . ." Wentz v. State, 188 N.W. 467, 468 (Neb. 1922). The definition includes "drawback," such as "something that works as a disadvantage . . . liabilities instead of assets." Webster’s Third New International Dictionary 1302 (2002). And it connotes "legal responsibility to another," which implicates fault. Black’s Law Dictionary 997 (9th ed. 2009).
¶93       Further, when interpreting the term "liability," we "may not subtract words from a statute, but instead should give effect to all words and phrases used and avoid interpretations that render statutory terms superfluous." Miller v. City & Cty. of Denver, 2013 COA 78, ¶30. Because the immunity provision includes a prohibition against both "liability" and "cause of action," these terms must have different meanings.
¶94       A "cause of action" is defined in part as "a factual situation that entitles one person to obtain a remedy in court from another person." Black’s Law Dictionary 251 (9th ed. 2009). And a "cause of action" is similar to a "claim," in that they both refer to a legal right that a party asserts in the suit that constitutes the action. Jaster v. Comet II Const., Inc., 438 S.W.3d 556, 564 (Tex. 2014). Thus, because the term "liability" must mean something different than remedies and claims, interpreting it to include certain affirmative defenses that rest on the fault of CIGA is supported by the plain language of the immunity provision.
¶95       Second, immunity provisions in other contexts have been held to preclude affirmative defenses that limit the amount of recovery by an organization provided with immunity. For example, in People ex rel. Grijalva v. Superior Court, 72 Cal. Rptr. 3d 53, 57 (Cal. Ct. App. 2008), the court explained:
The affirmative defenses of comparative fault and failure to mitigate damages seek to limit a defendant’s liability for compensatory damages based on the plaintiff’s own fault or inefficiency. Application of either defense here would reduce petitioner’s recovery based on a judge or jury’s finding that petitioner used unreasonable or inefficient methods to fight the fire. This is precisely the line of argument foreclosed by the Government Code. The immunity statutes protect fire fighters and fire fighting entities from incurring a financial penalty based on the "fire protection service [,]" "personnel, equipment or other fire protection facilities[,]" they provide, or do not provide.
¶96       Third, under the net worth provision, CIGA "shall have the right to recover" the amount of any covered claim paid on behalf of Menor. And where the word "shall" is used in a statute, it is presumed to be mandatory. See Sargent Sch. Dist. No. RE-33J v. W. Servs., Inc., 751 P.2d 56 (Colo. 1988). Yet, were Sunstate permitted to defeat or reduce that recovery because CIGA was at fault for having allegedly mishandled Menor’s claim, CIGA would still be out the funds that it purportedly overpaid to Menor. Cf. Potvin, 6 A.3d at 69 (rejecting interpretation that "there are some liabilities that the association is responsible for" based on the phrase "no liability"). And as a result, the practical effect of allowing the defenses could be reducing CIGA’s assets.
¶97       Fourth, this interpretation furthers the purposes of the Act. As discussed more fully above in connection with the recoupment claim, the negative consequences to CIGA of allowing Sunstate’s affirmative defenses could result in delayed payment and financial loss to claimants where insurers have become insolvent and increased costs to CIGA’s members. See Mosley, 119 P.3d at 580.
¶98       Given all of this, we agree with the trial court that the immunity provision barred Sunstate’s affirmative defenses.
V. Covered Claims
¶99       Sunstate next contends CIGA failed to prove the amount it could recoup because it did not present evidence that all payments to Menor were for "covered claims" under the Act. We agree in part, and so we set aside the trial court’s "ORDER RE: CIGA’S MOTION FOR ENTRY OF JUDGMENT ON LIQUIDATED DEBT" and remand for further proceedings.
A. Background
¶100       CIGA moved for "Entry of Judgment on Liquidated Debt." It argued that the amount it sought to recoup from Sunstate was "capable of ascertainment by computation." CIGA explained:
After paying claims to and on behalf of Mr. Menor, CIGA was statutorily permitted to offset monies Mr. Menor received in the [uninsured motorist] setting (whereas Fremont would not have had the right to an offset). CIGA was also able to obtain some recovery of amounts it paid, from both Sunstate and prescription medical expense provider. The claim loss amount was $871,795.59, and the total amount of expenses incurred in connection with the covered claim were $319,513.58, for a combined total of $1,191,309.17. CIGA was able to recover $76,263.62 from various sources. The amount CIGA expended, less recoveries, is $1,115,159.67.
CIGA attached to the motion an Excel spreadsheet that reconciled all of the amounts paid and subrogation payments received on Menor’s claims. Specifically, the spreadsheet showed "all claim costs for indemnity and medical benefits, as well as all associated medical, [and] vocational rehabilitation . . . ."
¶101       Sunstate opposed this motion, arguing that CIGA had "the burden of proving its damages," and, under the Act, "CIGA may only recover for payments it makes on covered claims." Yet, according to Sunstate, "CIGA failed to provide any basis or justification for the amounts it paid in connection with Menor’s workers’ compensation claim."
¶102       CIGA responded that "the amount of benefits Mr. Menor was entitled to recover was determined in the workers’ compensation proceedings in which Sunstate participated." And "any arguments about what payments were or were not required by contract could have been and were made by Sunstate and CIGA in the workers’ compensation setting."
¶103       The trial court granted CIGA’s motion. It acknowledged "Sunstate’s frustration in its inability to challenge CIGA’s payment of certain, highly suspect ‘covered claims,’" but held that Sunstate "may not challenge the nature or amount of CIGA’s payments, however inappropriate, to Mr. Menor on Fremont’s behalf" under the immunity provision.
B. Standard of Review and Law
¶104       Again, questions of statutory interpretation are subject to de novo review.
¶105       Under the Act, CIGA is entitled to recover "the amount of any covered claim," § 10-4-511(4)(a), which is defined as "an unpaid claim . . . [t]hat arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy." § 10-4-503(4)(a)(I).
¶106       A debt is "liquidated" if the amount due "is capable of ascertainment by reference to an agreement or by simple computation." Portercare Adventist Health Sys. v. Lego, 2012 CO 58, ¶15 (citation omitted). But that approach usually assumes a contract which "fixes a price per unit of performance, even though the number of units performed must be proved and is subject to dispute." Rotenberg v. Richards, 899 P.2d 365, 368 (Colo. App. 1995) (emphasis omitted) (quoting Restatement (Second) of Contracts § 354 cmt. c (Am. Law Inst. 1981)).
C. Application
 1. Immunity
¶107       Initially, we agree with Sunstate that the trial court erred in concluding CIGA was immune from challenges to whether all of the payments were on covered claims.
¶108       Courts under the Model Act "have refused to interpret . . . immunity [provisions] so broadly as to prevent an action that seeks to force [an association] to provide the service it was statutorily created to do — pay covered claims under the insurance policy." Boettcher, 154 P.3d at 635; see Potvin, 6 A.3d at 70 ("[T]he association may sue or be sued to compel it to pay covered claims that are within the association’s statutory obligations.") (citation and alterations omitted). In other words, while the immunity provision affords CIGA immunity from liability that arises from the performance of its duties, the provision "does not dispense with [CIGA’s] underlying obligation to perform those duties, including the duty to pay claims and to authorize treatment, under the [Act]." Potvin, 6 A.3d at 70.
¶109       Here, because Sunstate’s burden of proof argument rests on CIGA’s statutory obligation to pay only covered claims, we conclude that it is not barred by the immunity provision. Thus, the trial court erred in not reaching the merits of the covered claim issue. 
2. Insurance Policy
¶110       Turning to the merits, we first reject Sunstate’s assertion that CIGA was required to show Menor’s claims were covered under the workers’ compensation policy — which CIGA conceded it had neither obtained nor even reviewed.
¶111       Sunstate does not cite any case, nor have we found one, conditioning an association’s recoupment claim on evidence of the terms of the underlying workers’ compensation policy. The only authority provided by Sunstate is 1 Couch on Insurance section 6:28, Westlaw (database updated Dec. 2015) ("In determining whether a claim is ‘covered,’ the precise language of both the guarantee fund authorizing statute and the policy coverage of the contract with the insolvent insurer must be considered."). But to our knowledge, no court has relied on this language to impose such a requirement in the workers’ compensation context.
¶112       This lack of authority can be explained because Sunstate’s assertion that recoupment of payment on a "covered claim" requires proof of the underlying workers’ compensation policy provision is at odds with the particular nature of such insurance. Unlike most forms of insurance, where the scope of coverage and policy limits vary greatly, Colorado employers are required to maintain workers’ compensation insurance obligating the insurer to pay any compensation to the employee for which the employer becomes statutorily liable. § 8-44-105, C.R.S. 2015.[5] And as discussed in Part III.C above concerning the second Eldridge factor, in a workers’ compensation proceeding either the employer or the employee may litigate the necessity and reasonableness of specific medical payments or benefits based on this statutory requirement, not as a matter of policy limits.
¶113       Therefore, we decline to hold that CIGA was required to produce a copy of the policy to prove that its payments for Menor’s benefit were on covered claims.
3. CIGA’s Burden of Proof
¶114       Even so, we agree with Sunstate that because CIGA failed to prove that all amounts it paid on Menor’s workers’ compensation claim were on covered claims, summary judgment for a liquidated debt was improper. This is so because the spreadsheet attached to CIGA’s motion did not provide any information linking those amounts to either the industrial injury for which Fremont admitted liability or AUJ orders entered in the workers’ compensation proceeding. Indeed, the only order from that entire proceeding which appears in the record deals with the 2010 interim settlement agreement.
¶115       True enough, section 8-42-101(1)(a), C.R.S. 2015, imposes a broad obligation:
Every employer, regardless of said employer’s method of insurance, shall furnish such medical, surgical, dental, nursing, and hospital treatment, medical, hospital, and surgical supplies, crutches, and apparatus as may reasonably be needed at the time of the injury or occupational disease and thereafter during the disability to cure and relieve the employee from the effects of the injury.
But "reasonably be needed" cannot be determined without some information concerning the nature and extent of Menor’s injury. Yet, CIGA provides no such information in the summary judgment record. The spreadsheet was prepared by an information technology manager, not a claims administrator.
¶116       Nor does Fremont’s FAL admission that Menor suffered a permanent, total disability lead to a different analysis. As the supreme court explained in Grover, 759 P.2d at 709-10 (emphasis added):
We thus construe the statutory language "thereafter during the disability" in section 8-49-101(1)(a) [now at section 8-42-101(1)(a), C.R.S. 2015] as legislative authority for the hearing officer and the commission to order the employer to pay the claimant’s medical expenses for any future treatment reasonably necessary to relieve the claimant from the effects of the industrial injury or occupational disease even though such treatment will not be received until sometime subsequent to the award of permanent disability.
¶117       Despite the touchstone of "reasonably necessary," for which CIGA provides no evidence, CIGA argues that summary judgment was proper because "notwithstanding Sunstate’s ability to review the complete workers’ compensation file, Sunstate failed to present the trial court with any evidence whatsoever that the Menor claims were not paid in conformity with the [workers’ compensation act]." But the burden to make such a showing was not on Sunstate. Instead, as the party seeking to recover, CIGA had the burden of presenting competent evidence to show that it was entitled to recoup the amounts it sought from Sunstate. See Realty Loans, Inc. v. McCoy, 523 P.2d 476, 478 (Colo. App. 1974) (not published pursuant to C.A.R. 35(f)).
¶118       As applied here, that burden required CIGA to show that the amounts it paid on Menor’s claim — and sought to recover under the net worth provision — were either specifically authorized in the underlying workers’ compensation proceedings or met the reasonably necessary test if the order or orders in that proceeding "did not specify the nature of any future medical benefits that might be required." Milco Constr. v. Cowan, 860 P.2d 539, 541-42 (Colo. App. 1992). CIGA has not satisfied this burden merely because, as it asserts, "[t]he amount CIGA sought to recover is capable of ascertainment by computation." This assertion begs the "covered claim" question, as shown by the trial court’s observation about "CIGA’s payment of certain, highly suspect ‘covered claims.’" See Rotenberg, 899 P.2d at 368 ("While defendant may contest the number of hours plaintiff reasonably devoted to his cause, the amount is ‘determinable’ within the meaning of [section] 13-80-103.5 once such dispute is resolved.").
¶119       Nor can CIGA shift this burden to Sunstate based on the interim settlement agreement. The order accepting that agreement acknowledges litigation over CIGA’s reimbursement claim. Then it provides, "these issues are still subject to dispute, and not resolved by this stipulated partial settlement agreement."
¶120       Therefore, because the evidence provided by CIGA did not prove that all of the payments had been made on a covered claim, we must set aside the trial court’s order granting the motion for entry of judgment on liquidated debt and remand for further proceedings.
VI. Offset
¶121       Finally, Sunstate contends that while the trial court correctly held it was entitled to an offset against the recoupment claim based on payments to CIGA from proceeds of the Fremont liquidation to avoid a double payment to CIGA, the court miscalculated the amount of the offset. CIGA defends the trial court’s calculation. But on cross-appeal, CIGA asserts that an offset to avoid double recovery was improper because its claim in the liquidation must be reduced by any net worth recoveries and allocable liquidation proceeds distributed to CIGA must be returned. CIGA also points out that Sunstate has filed a claim in the liquidation, and to the extent it pays the recoupment claim, it will be in the same creditor class as CIGA. At oral argument, Sunstate conceded this point. We address these issues together and conclude the trial court erred by providing an offset.
A. Background
¶122       The trial court found that including the final settlement, CIGA had paid $795,531.97 to or for the benefit of Menor and that CIGA had received $8,085,622.00 in early access distribution (EADs) from the Fremont liquidation, which is ongoing. It also found that CIGA’s payments on Fremont claims totaled approximately $11,500,000 and CIGA had reserved approximately $8,000,000 for future payments on Fremont claims. The court explained:
Equity dictates that the statute be read to mean that Sunstate is responsible for reimbursing CIGA only for the balance of Mr. Menor’s claim after accounting for the Freemont [EADs], not the claim’s full amount.
¶123       Then the court calculated the offset on the basis that the $795,531.97 paid "represented 9.84% of the EADs made by Fremont to CIGA." The court did not specifically address Sunstate’s assertion that before judgment could be entered, it was entitled to discover the amount of any EADs received by CIGA between 2012, when those payments totaled $8,085,622.00, and the date judgment would be entered. Nor did it address CIGA’s assertion that ultimately a double payment to CIGA could not occur.
¶124       On appeal, Sunstate argues, as it did below, that the offset should have been calculated by first determining the ratio of the EADs ($8,085,622.00) to the total amount paid out on Fremont claims ($11,475,679), which is 70.56%, and then applying this percentage to reduce the total payment of $795,531.97 for purposes of the recoupment claim.[6]
¶125       CIGA responds that the trial court correctly calculated the offset. Also, CIGA argues, as it did below, that Sunstate should not be entitled to any offset because CIGA will not receive a double payment; to the extent of payment on the recoupment claim, CIGA must reduce its claim in the Fremont liquidation and Sunstate will have its own claim in that liquidation.
¶126       CIGA’s reply brief includes two documents not in the record showing that in 2009 Sunstate made a claim against the Fremont Liquidating Trust and that in response the California Insurance Commissioner told Sunstate, "[t]o the extent that Sunstate reimburses the Colorado IGA, your Proof of Claim will be approved as a Class 2 claim." Neither document indicates service on CIGA. We ordered Sunstate to file a supplemental brief addressing them.
¶127       According to that brief, "Sunstate’s counsel has recently discovered that a Sunstate employee timely filed a Contingent & Undetermined Claim in advance of the June 30, 2004 Claims Bar Date." Sunstate does not dispute the authenticity of CIGA’s documents. However, Sunstate points out that "a Catch-22 circumstance is created" because, even if it can file a claim in the liquidation, that claim would be premature until it pays CIGA. Then it asserts that because CIGA did not raise this argument below, it should not be allowed to do so now; in allowing an offset, the trial court did not consider future occurrences in the liquidation; and ongoing developments in the liquidation — primarily CIGA’s receipt of additional EADs — favor a remand.
B. Standard of Review and Law
¶128       The parties agree that the proper measure of damages presents a question of law subject to de novo review. However, an appellate court affords a trial court’s damages award considerable deference and will set it aside only if clearly erroneous. See Lawry v. Palm, 192 P.3d 550, 565 (Colo. App. 2008) ("The fact finder has the sole prerogative to assess the amount of damages, and its award will not be set aside unless it is manifestly and clearly erroneous.").
¶129       The Act does not address offsets based on proceeds from the liquidation of an insolvent insurer. Section 10-4-512, C.R.S. 2015, — titled "Nonduplication of recovery" — only addresses nonduplication of recovery by insureds. See Menor, 166 P.3d at 210.
¶130       Instead, Sunstate relies on the general principle that a plaintiff "may not receive a double recovery for the same wrong." Schuessler v. Wolter, 2012 COA 86, ¶63. It also notes that in Stephens v. Colaiannia, 942 P.2d 1374, 1379 (Colo. App. 1997), the division recognized a form of offset by holding that where claimants had been paid from both an insolvent insured’s receiver and an out-of-state guaranty association, the association had a claim against the receiver.
¶131       CIGA neither disputes this general principle nor cites authority contrary to Stephens. Still, as it did before the trial court, CIGA denies any possibility of a double recovery because, under the California Insurance Code, its claim in the liquidation proceeding — which will be paid on a pro rata basis along with claims of other states’ guaranty associations — must be reduced to the extent that it obtains net worth recoveries.
¶132       Sunstate does not challenge CIGA’s analysis of California law. Rather, according to Sunstate, because CIGA allegedly failed to give Sunstate timely notice that it had taken over payment on Menor’s claim,
CIGA cannot, on the one hand, cause Sunstate to miss a claims filing deadline in the Freemont liquidation, and then, on the other, argue Sunstate may only seek reimbursement (which it now cannot) from the Freemont estate.
(Emphasis added.) However, in its supplemental brief, Sunstate abandons this position.
C. Application
¶133       We begin with CIGA’s assertion that Sunstate was not entitled to any offset because a double recovery could not occur. If CIGA is correct, then the questions of whether the EADs should have been redetermined as of the date of judgment and the trial court used correct methodology in calculating the offset need not be decided. Nor could Sunstate’s request for a remand to bring current the amount of EADs paid to CIGA affect the outcome. As a matter of law, we conclude that Sunstate was not entitled to an offset.
1. Preservation
¶134       Initially, we reject Sunstate’s assertion — made in its supplemental brief — that CIGA never argued below that "Sunstate’s remedy is in the Fremont liquidation." In CIGA’s motion for entry of judgment on liquidated debt, it argued:
When a final distribution is made by Fremont, CIGA will be reimbursed by Fremont at the same percentage paid to all other claimants in a similar class, less the EADs it received prior to the final distribution, and less any recoveries (such as net worth recoveries). This means that if CIGA recovers under the net worth provision from Sunstate, it will not have a claim against Freemont for the amount Sunstate paid CIGA. Sunstate’s payment to CIGA will simply reduce the amount CIGA can seek from Fremont. Instead of CIGA, Sunstate will then have the claim against Fremont, at the same class level CIGA held previously.
 
(Emphasis added.) And during the hearing on this motion, CIGA further explained:
[I]f Sunstate pays us what we’re owed . . . anything that we got from early-access distribution payments from Fremont that would be proportioned to Mr. Menor’s claim have to go back to Fremont. That has to go back to them. And then Sunstate, assuming that they file their notice of proof of claim, which I think they did, then they have a claim and they step into the shoes of CIGA for whatever CIGA would have been able to recover.
¶135       In response, Sunstate argued:
CIGA’s reading of the statutes it now cites for the first time is self-serving and unsupported. More critically, however, CIGA again couches legal argument as "fact," when, in truth, there is no evidence in the record about exactly how and why CIGA received the funds it did from the Fremont receivership and whether it took into consideration claims paid and/or those to be paid in the future, the terms of any purported "claw back" agreement, and even whether Sunstate had notice and opportunity [to] timely file a claim in the Fremont bankruptcy.
¶136       We conclude that these arguments sufficiently preserved this issue.
2. Analysis
¶137       Under the net worth provision, CIGA has the right to recover from Sunstate "the amount of any covered claim." Subject to the constitutional challenges rejected above, Sunstate does not dispute this. Instead, it argues that allowing CIGA to recover the full amount of Menor’s claim — without offsetting some portion of EADs made to CIGA from the Fremont liquidation — would result in double recovery for CIGA.
¶138       But California law, which controls the Fremont liquidation, dispels the specter of a double recovery.
¶139       As to EADs, the California Insurance Code section 1035.5(a) (West 2016), provides that during the liquidation of an insolvent insurer:
[T]he commissioner shall make application to the court for approval of a proposal to disburse the insurer’s assets, from time to time as such assets become available, to the California Insurance Guarantee Association, or the California Life and Health Insurance Guarantee Association, and to any entity or person performing a similar function in another state.
(Emphasis added.) This proposal must include a provision for:
The securing by the commissioner from each of the associations entitled to disbursements . . . an agreement to return to the commissioner such assets previously disbursed as may be required to pay claims of secured creditors and claims falling within the priorities established in paragraphs (1) to (5), inclusive, of subdivision (a) of Section 1033 in accordance with the priorities.
§ 1035.5(b)(4) (emphasis added).
¶140       Sunstate is correct that the record does not include the agreement between CIGA and the California Insurance Commissioner. Even so, California courts have held that EADs "are not [the association’s] assets, but assets of the [liquidated insurer’s] estate." Cal. Ins. Guar. Ass’n v. Superior Court, 75 Cal. Rptr. 2d 461, 465 (Cal. Ct. App. 1998). Therefore, "to the extent [an association] pays covered claims with [EADs] . . . the [liquidated insurer’s] estate is entitled to the proceeds of any subrogation action." Id. at 467.
¶141       Because the net worth claim at issue is in effect a subrogation action, to the extent that CIGA recovers its payments on Menor’s claims from Sunstate, it must return any EADs paid to the Fremont liquidation estate. See id. ("[T]o the extent [an association] pays covered claims with its own assets, such as proceeds from the premiums it charges its members, it is entitled to retain the amounts it recovers through subrogation actions."). And as explained in the letter from the California Insurance Commissioner, once Sunstate reimburses CIGA, Sunstate will have a Class 2 claim. See Cal. Ins. Code § 1033(a) (West 2016) ("Claims allowed in a proceeding under this article shall be given preference in the following order: (1) Expense of administration. (2) All claims of the California Insurance Guarantee Association . . . and associations or entities performing a similar function in other states . . . .").
¶142       Still persisting, Sunstate argues that "as the entity that engaged and paid premiums to Fremont[, it] should enjoy the . . . benefit from any EADs . . . ." CIGA does not dispute that Sunstate paid premiums to an insurer that became insolvent. Yet, as explained in Part III above, because Sunstate’s net worth exceeded $25 million, the legislature determined that it was more able to absorb an unexpected loss due to an insolvent insurer than other insureds.
¶143       Further, allowing Sunstate to reduce CIGA’s net worth claim based on the EADs would grant Sunstate a de facto priority over other creditors in the Fremont liquidation. A close look shows that if, on the one hand, Sunstate pays the full amount of Menor’s claim to CIGA, when CIGA returns EADs to the estate allocable to that claim, those funds become available to other creditors — including Sunstate — based on a statutory priority under California Insurance Code section 1033(a). See Cal. Ins. Guar. Ass’n, 75 Cal. Rptr. 2d at 467 (requiring an association to return EADs for claim amounts recovered through subrogation "protect[s] insureds and injured parties with claims against the insolvent insurer . . ."). But if, on the other hand, Sunstate gets a direct offset, then the amount of that offset is not subject to the dilution of creditors’ claims because liquidation proceeds are less than the total claims.
¶144       In the end, we conclude that the trial court erred by providing Sunstate with an offset. On remand, if the court enters a judgment in favor of CIGA — either after further motion practice or trial — the court shall not grant Sunstate an offset.
CROSS-APPEAL
VII. CIGA’s Attorney Fees
¶145       In addition to its contention regarding offset, CIGA contends on cross-appeal that the trial court erred by declining to award it attorney fees incurred defending against and handling Menor’s claim. We discern no error.
A. Background
¶146       Before the trial court, CIGA sought the amount paid on Menor’s claim, along with "the total amount of expenses incurred in connection with the covered claim." It argued that such expenses were part of the "covered claim." Sunstate responded that "attorney fees and other legal and investigative expenses incurred by CIGA in connection with its handling of Menor’s claim" could not be recovered. The trial court held that the term "covered claim" includes "the amounts Fremont would have paid to Mr. Menor, not administrative expenses or attorney fees."
B. Standard of Review and Law
¶147       Whether a statute provides for an attorney fees award is a question of statutory interpretation and, thus, a question of law we review de novo. Castro v. Lintz, 2014 COA 91, ¶11.
¶148       Under the so-called "American rule," attorney fees are generally not recoverable unless otherwise provided by a statute, court rule, or contract. See, e.g., Adams v. Farmers Ins. Grp., 983 P.2d 797, 801 (Colo. 1999).
C. Application
¶149       CIGA argues that because the attorney fees it incurred in defending and handling Menor’s claim constitute part of the "covered claim," under the net worth provision it is entitled to recover those fees as amounts paid "on behalf of" Menor. We conclude that the plain language of the Act defeats this argument.
¶150       Under the Act, CIGA is "deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." § 10-4-508(1)(b). Even so, the Act limits CIGA’s recoupment to "the amount of any covered claim paid on behalf of such person . . . ." § 10-4-511(4)(a). Of course, insurers retain counsel to represent their insureds. But they do so on behalf of their insureds and to protect their own interests, not on behalf of third party claimants such as Menor. To the contrary, some of the attorney fees that CIGA sought to recover were incurred opposing Menor’s claim.
¶151       As relevant here, the definition of "covered claim" encompasses "an unpaid claim, including one for unearned premiums . . . [t]hat arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy . . . ." § 10-4-503(4)(a)(I). And according to Barr v. Colorado Insurance Guaranty Association, 926 P.2d 102, 104 (Colo. App. 1995), a "covered claim" is "a claim that should have been paid by the insurer pursuant to the policy but for the insurer’s insolvency." Thus, the definition of covered claim does not include the attorney fees paid by CIGA in defending against or handling Menor’s claim.
¶152       This interpretation is supported by looking to the Act as a whole. See Charnes v. Boom, 766 P.2d 665, 667 (Colo. 1988) ("[W]e must read and consider the statutory scheme as a whole to give consistent, harmonious and sensible effect to all its parts."). Another section of the Act distinguishes between claims paid and expenses incurred. See § 10-4-508(1)(c) ("[CIGA] shall . . . [a]llocate claims paid and expenses incurred . . . ."). If the General Assembly had wanted to provide that in a recoupment action CIGA could recover expenses in addition to the amount of covered claims, it could have done so. See People v. Moore, 2013 COA 86, ¶14 ("[H]ad the legislature intended that the statute cover victims who were not public employees, it could have done so by express language . . . .") (cert. granted Mar. 24, 2014).
¶153       Accordingly, we conclude the trial court did not err in declining to award CIGA attorney fees associated with defending and handling Menor’s claim.
VIII. Conclusion
¶154       The judgment is reversed to the extent that the trial court found that CIGA had proven its payments to or for Menor’s benefit were all on a covered claim and allowed Sunstate an offset for EADs. The case is remanded for further proceedings to determine whether the full amount that the court determined CIGA had paid on Menor’s claim was for a covered claim and to recalculate interest accordingly. In all other respects, the judgment is affirmed.
JUDGE J. JONES and JUDGE BOORAS concur.

[1] CIGA does not dispute the premise implicit in Sunstate’s due process argument that its recoupment claim under the Act constitutes state action. See Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982) (State action occurs when the alleged deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible."). Nor could it. See Sotack v. Pa. Prop. & Cas. Ins. Guar. Ass’n, 104 F. Supp. 2d 471, 479 (E.D. Pa. 2000) (Because the guaranty association "(1) was created by special statute, (2) was created for the purpose of pursuing state objectives, and (3) is controlled by the state, [it] is a government entity.").
[2] To the extent a magistrate judge in the dismissed federal district court action commented on this issue in a discovery order, the comment was dictum that does not bind us. See Hickman v. Catholic Health Initiatives, 2013 COA 129, ¶26.
[3] Giving an association immunity from liability that arises from performance of its duties does not mean that the immunity provision "permit[s] [an] association to act improperly in the handling of all claims without any consequences." Potvin v. Lincoln Serv. & Equip. Co., 6 A.3d 60, 70-71 (Conn. 2010). Other provisions of the Act "provide alternative mechanisms for ensuring that [an] association" does not act improperly. Id. For example, the Act gives the insurance commissioner considerable control over the association, including approving the members of the board of directors, section 10-4-507, C.R.S. 2015, and approving a plan of operation, section 10-4-509, C.R.S. 2015.
[4] We express no opinion on how the immunity provision would apply to other affirmative defenses that may not so clearly arise from "any action taken by [CIGA] in the performance of their powers and duties under this part 5." See § 10-4-517. For example, if, after having completed the claims adjustment and payment process, CIGA unreasonably delayed in filing a net worth claim, a laches or statute of limitations defense might lack the requisite nexus.
[5] This section has included this requirement since it was first enacted in 1919. Ch. 210, sec. 25, 1919 Colo. Sess. Laws 709.
[6] In doing so, Sunstate maintains its positions that the discovery it requested may have shown CIGA has received more than $8,085,622.00 from the liquidation and that had summary judgment not been entered, further proceedings may have reduced the $795,531.97 based on either affirmative defenses or the covered claims issue.